IN THE UNITED STATES DISTRICT COURT FOR THE

WESTERN DISTRICT OF OKLAHOMA


UNITED STATES OF AMERICA,     )
                                  )
     Plaintiff,          )
                                  )
     -vs-                )  Case No. CR-18-297-R
                                  )
CHAD WAYNE KASPEREIT,      )
                                  )
     Defendant.          )


\* \* \* \* \* \* \*

TRANSCRIPT OF

ELECTRONICALLY RECORDED PROCEEDINGS

HAD ON JANUARY 18, 2019

BEFORE THE HONORABLE GARY M. PURCELL

U.S. DISTRICT JUDGE, PRESIDING

\* \* \* \* \* \* \*


**REDACTED**

DETENTION HEARING


Proceedings recorded by mechanical stenography; transcript

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

produced by computer-aided transcription.

<u>A P P E A R A N C E S</u>


<u>ON BEHALF OF THE GOVERNMENT</u>:

    Ms. K. McKenzie Anderson
    Assistant United States Attorney
    U.S. Attorney's Office
    210 West Park Avenue
    Suite 400
    Oklahoma City, Oklahoma 73102


<u>ON BEHALF OF THE DEFENDANT</u>:

    Mr. David W. Hammond
    Attorney at Law
    1102 W. Maple Avenue
    Duncan, Oklahoma 73533

**I N D E X**

**PAGE**

EVIDENCE ON BEHALF OF THE GOVERNMENT:

CHAD OUBRE
       Direct Examination by Ms. Anderson . . . . . 05
       Examination by the Court . . . . . . . . .72
       Cross-Examination by Mr. Hammond . . . . . . 75
       Redirect Examination by Ms. Anderson . . . . 88
       Recross-Examination by Mr. Hammond . . . . . 92
       Examination by the Court . . . . . . . . .93

GOVERNMENT RESTS . . . . . . . . . . . . . .94

ARGUMENT ON BEHALF OF THE GOVERNMENT . . . . . . .95

ARGUMENT ON BEHALF OF THE DEFENDANT . . . . . . . 106

FINAL ARGUMENT ON BEHALF OF THE GOVERNMENT . . . .112

RULING OF THE COURT . . . . . . . . . . . . . 114

CERTIFICATE OF REPORTER . . . . . . . . . . . 139

```
1                    P R O C E E D I N G S
2          (The following proceedings were had January 18, 2019,
3     with Court, counsel, and defendant present:)
4               THE COURT:  The Court calls the case of the United
5     States of America vs. Chad Wayne Kaspereit.  This is Case
6     CR-18-297-R.
7          Ms. Anderson is here for the United States.  Mr. Hammond
8     appears along with the defendant.  The matter comes on for a
9     detention hearing.
10         In that regard, Ms. Anderson, is the government ready to
11    proceed, do you acknowledge receipt of the written pretrial
12    services report, and are you in compliance with the Justice
13    For All Act?
14              MS. ANDERSON:  Yes, your Honor, to all three
15    questions.
16              THE COURT:  Mr. Hammond, are you ready to proceed
17    and do you acknowledge receipt of the written pretrial
18    services report?
19              MR. HAMMOND:  Yes, your Honor, on both questions.
20              THE COURT:  The Court is in receipt of the written
21    pretrial services report and will announce that the Court will
22    consider the contents of that report as evidence for the
23    purpose of this proceeding.
24         With that said, Ms. Anderson, do you wish to present any
25    evidence?
```

*DIRECT EXAMINATION OF CHAD OUBRE*

1          MS. ANDERSON:  Yes, your Honor.

2          THE COURT:  Call your first witness.

3          MS. ANDERSON:  The United States calls ATF Special

4    Agent Chad Oubre.

5      (The witness was duly sworn.)

6          THE CLERK:  Please have a seat.

7          THE COURT:  Ms. Anderson, whenever you are ready.

8                         **CHAD OUBRE,**

9    called as a witness herein, having been first duly sworn,

10   was examined and testified as follows:

11                      **DIRECT EXAMINATION**

12   BY MS. ANDERSON

13   Q    Could you please state your name.

14   A    My name is Chad Oubre.

15   Q    And --

16          THE COURT:  For the purpose of the record, would you

17   spell your last name, please.

18          THE WITNESS:  It's O-U-B-R-E.

19          THE COURT:  Thank you.

20   Q    (By Ms. Anderson) And where do you work?

21   A    I am a special agent with the Bureau of Alcohol, Tobacco,

22   and Firearms.

23   Q    How long have you been a special agent with ATF?

24   A    Since 2009.

25   Q    All right.  And are you familiar with an investigation

DIRECT EXAMINATION OF CHAD OUBRE

1   into Chad Wayne Kaspereit?

2   A     I am.

3   Q     Are you the case agent for this case?

4   A     I am.

5   Q     And have you reviewed law enforcement reports, videos,

6   and audio recordings of other law enforcement officers?

7   A     I have.

8   Q     Have you also prepared reports of interviews you've

9   personally conducted?

10  A     I have.

11  Q     All right.  I would like to focus at the beginning on the

12  nature and circumstances of the offenses as charged and the

13  weight of evidence of those offenses.  Okay?

14        Are you familiar with the three counts in the Indictment?

15  A     I am.

16  Q     Okay.  Is it fair to say that all three counts involve

17  two victim protective orders?

18  A     Correct.

19  Q     And are you familiar with the timeline of those two

20  protective orders?

21  A     I am.

22  Q     All right.  Let's go through the timeline and then we'll

23  fill in details after that.

24             MS. ANDERSON:  Your Honor, may I approach?

25             THE COURT:  Certainly, you may.

*DIRECT EXAMINATION OF CHAD OUBRE*

1  Q    (By Ms. Anderson) All right.  I have provided you with a

2  binder of documents with tabs.  Do you recognize that binder?

3  A    I do.

4  Q    Have you reviewed all of the documents that are contained

5  in that book?

6  A    I have.

7  Q    And what are they generally?

8  A    These are documents pertaining to victim protection

9  orders, police reports, reports that I've created, and other

10 law enforcement reports, all pertaining to Chad Kaspereit and

11 his involvement.

12 Q    Okay.  Does it also contain photos?

13 A    It contains photos, yes.

14 Q    And 911 reports or logs?

15 A    911 call logs, yes.

16 Q    Okay.

17           MS. ANDERSON:  Your Honor, the Government moves to

18 admit this binder of exhibits for efficiency's sake.

19           MR. HAMMOND:  I have no objection, your Honor.

20           THE COURT:  It will be admitted for the purpose of

21 this proceeding only.

22 Q    (By Ms. Anderson) All right.  Let me direct you to

23 Exhibit 1.  What is this document?

24 A    This is an emergency order of protection filed in

25 Stephens County, and it was filed on September 3rd of 2015.

*DIRECT EXAMINATION OF CHAD OUBRE*

1    Q    Okay.  Who was it filed by?

2    A    It was filed by a Brittany Nicole Kaspereit.

3    Q    And it was filed -- who was it filed against?

4    A    Chad Wayne Kaspereit.

5    Q    And what was the relationship between the two of them at

6    the time?

7    A    They were married.

8    Q    All right.  And does this emergency VPO notice a hearing?

9    A    It does.  It notices a hearing that was to take place on

10   September 14th of 2015.

11   Q    All right.  And are you aware, did that hearing take

12   place?

13   A    It did.

14   Q    All right.  And does this order prohibit Mr. Kaspereit

15   from harassing, threatening, or intimidating Mrs. Kaspereit,

16   now Ms. McCormick?

17   A    Yes.

18   Q    And did it prohibit the use of physical force against

19   her?

20   A    Yes.

21   Q    And let me direct you to page 4, paragraph 5.  What does

22   it do there?

23   A    This is a notice to Mr. Kaspereit that it is against

24   federal law for him to possess a firearm while under this

25   protection order.

*DIRECT EXAMINATION OF CHAD OUBRE*

1  Q    All right.  Let's turn to Exhibit 2, please.  What is

2  this document?

3  A    This is a temporary order, which is what occurs after the

4  hearing we previously just mentioned.

5  Q    Is there the same case number handwritten on that?

6  A    Yes.

7  Q    Okay.  And did Mr. Kaspereit or his attorney sign this

8  document?

9  A    They did.

10 Q    And does the Court indicate there was a hearing and

11 Mr. Kaspereit had an opportunity to participate in that

12 hearing?

13 A    That's correct.

14 Q    All right.  What does this temporary order do with

15 respect to the emergency order we just looked at?

16 A    It puts it in full effect.  So the emergency order puts

17 it in effect temporarily until there can be a hearing, and

18 this order puts it in effect thereafter.

19 Q    And does it have an expiration date?

20 A    This order does not have an expiration date, no.

21 Q    All right.  Let's go to Exhibit 3.  What is this?

22 A    This is an order setting a hearing.  So there was a

23 motion filed on January 26th of 2018 to have that temporary

24 order dismissed.

25 Q    Okay.  And sets it for hearing.  What's the date for the

*DIRECT EXAMINATION OF CHAD OUBRE*

1  hearing?

2  A    February 26th of 2018.

3  Q    Turn to Exhibit 4, please.  And what is this?

4  A    This is a copy of the docket pertaining to that hearing

5  and that protection order.

6  Q    And what happened at that hearing on February 26, 2018?

7  A    That order was dismissed on that date.

8  Q    Okay.  Based on those court records, is it fair to say

9  that this VPO was in effect from September 3, 2015, until it

10 was dismissed on February 26, 2018?

11 A    Correct.

12 Q    Turn to Exhibit 5, please.  What is this?

13 A    This is another emergency order of protection filed by

14 Stephanie Nicole Carson, also known as Stephanie Nicole

15 Kaspereit, against Chad Wayne Kaspereit.  And they are married

16 at this time.

17 Q    And this is a different wife; is that correct?

18 A    Correct.  This is a different order which was filed on

19 March 19th of 2018.

20 Q    And about how much time had passed between when the last

21 one was dismissed and this one was entered?

22 A    Not quite a month.

23 Q    Okay.  And does this emergency order of protection

24 indicate whether a weapon was involved?

25 A    It indicates that there was a weapon involved.

1   Q    All right.  On page 2, does the emergency order notice a

2   hearing?

3   A    It was.  There was a hearing ordered to take place on the

4   2nd of April, 2018.

5   Q    Okay.  Does this emergency VPO prohibit physical force

6   against an intimate partner?

7   A    It does.

8   Q    And page 3, paragraph 10, what happens to firearms by the

9   terms of this order?

10  A    It's ordered in this document that the defendant shall

11  immediately surrender all firearms and dangerous weapons to

12  law enforcement.

13  Q    Okay.  And page 4, paragraph 5?

14  A    It's another notice to Mr. Kaspereit that possession of a

15  firearm or ammunition while under this order is a violation of

16  federal law.

17  Q    Let's turn to Exhibit 6, please.  What is this?

18  A    This is a final order of protection filed by Stephanie

19  Kaspereit against Chad Wayne Kaspereit, and they are married.

20  And this one was filed on May 21st of 2018.

21  Q    Okay.  And what does it say on page 2, paragraph 2?

22  A    That this is a final order pertaining to domestic abuse

23  and/or stalking.

24  Q    Okay.  And did the Court make any finding as to whether

25  Mr. Kaspereit represented a credible threat to the physical

*DIRECT EXAMINATION OF CHAD OUBRE*

1   safety of an intimate partner or child?

2   A    Yes.

3   Q    And was there a hearing before this final order was

4   entered?

5   A    There was.

6   Q    And did Mr. Kaspereit have notice of that hearing?

7   A    He did.

8   Q    And did he have an opportunity to participate at that

9   hearing?

10  A    He did.

11  Q    All right.  When did this protective order -- this final

12  protective order expire -- or when will it expire?

13  A    It will expire on May 20th of 2023.

14  Q    Okay.  And did that order also prohibit Mr. Kaspereit

15  from harassing, threatening, or intimidating an intimate

16  partner?

17  A    Correct.

18  Q    And did it restrict his ability to possess firearms?

19  A    It does.

20  Q    Okay.  Is that final protective order still in place?

21  A    It is.

22  Q    Okay.  So is it -- let's turn now to a few incidents and

23  events involving guns that occurred in this time -- these time

24  periods.

25       So could you turn to Exhibit 7, please.  What is this?

1   A     This is a report of an interview that I generated in

2   which I conducted an interview with Brittany McCormick.

3   Q     And did Ms. McCormick tell you about guns Mr. Kaspereit

4   had when they were married?

5   A     She did.

6   Q     And after that first VPO was entered in September of

7   2015, did he move out?

8   A     He did.

9   Q     And where was he living?

10  A     He lived at his dad's house in Duncan.

11  Q     Okay.  And what physically happened to the guns?

12  A     So the guns that Chad owned at the time the VPO was

13  issued remained at Brittany's house for approximately two

14  months, after which Chad, his father, and another family

15  member came and retrieved the guns from Brittany's house.

16  Q     Okay.  And based on her understanding, where did they

17  take them?

18  A     Back to Chad's father's house.

19  Q     And that was where he was residing?

20  A     Correct.

21  Q     And was the VPO in effect at that time?

22  A     It was.

23  Q     And did Ms. McCormick recall anything about Mr. Kaspereit

24  hunting while the VPOs were in place?

25  A     She stated that that was a frequent activity of his, and

*DIRECT EXAMINATION OF CHAD OUBRE*

1   specifically she remembers that he did go hunting in 2016,

2   with a rifle.

3   Q      And that was while the VPO was in place?

4   A      Correct.

5   Q      And then, more recently, has Mr. Kaspereit contacted

6   Ms. McCormick about guns?

7   A      Yes.  In 2018, text messages were sent to Ms. McCormick

8   asking if she had any firearms to sell.

9   Q      And was that while the newest VPO was in effect?

10  A      Correct.

11  Q      Okay.  Let's turn to Exhibit 8.  What is this document?

12  A      This is a decree of dissolution of marriage filed on

13  September 23, 2016.  So this is a divorce decree between

14  Brittany Kaspereit McCormick and Chad Kaspereit.

15  Q      And did Mr. Kaspereit and his attorney sign this?

16  A      They did.

17  Q      All right.  Let me direct you to page 7.

18         Where was Mr. Kaspereit living at the time?

19  A      He lives at an address of 1490 East Elk in Duncan, which

20  is his father's address.

21  Q      Okay.  And let me direct to you page 9.

22         What happens in terms of property?

23  A      It's -- this portion of the order directs property to be

24  given to either party in one way, shape, or form.  And,

25  specifically, there are several firearms that are awarded to

*DIRECT EXAMINATION OF CHAD OUBRE*

1   Mr. Kaspereit in this decree.

2   Q    Okay.  And in paragraph 20, what's supposed to happen

3   with the property as a result of this divorce decree?

4   A    They are to exchange the property within ten days of this

5   decree.

6   Q    And on page 12, paragraph 29, what else are they supposed

7   to do with respect to the property?

8   A    This is where it decries that all title is supposed to be

9   handed over as this order dictates, and it says if title are

10  not transferred, that this order constitutes the title of

11  those items.

12  Q    And the property is conveyed by this document; is that

13  correct?

14  A    Correct.

15  Q    According to Ms. McCormick, did Mr. Kaspereit already

16  have the guns listed in this divorce decree?

17  A    Yes.

18  Q    Okay.  And this was September of 2016; correct?

19  A    Correct.

20  Q    Is -- was there a VPO in effect?

21  A    Yes.

22  Q    Let's turn to Exhibit 9.  What is this document?

23  A    This is an ATF Form 4473.  It's the document that's

24  created and required to be signed any time you purchase a

25  firearm from a licensed dealer.

*DIRECT EXAMINATION OF CHAD OUBRE*

1    Q    And where did this particular 4473 come from?

2    A    From Academy Sports in Yukon, Oklahoma.

3    Q    And who was the purchaser in this transaction?

4    A    Chad Kaspereit.

5    Q    And what did he buy?

6    A    He bought a Taurus 45/410-caliber Judge Revolver as well

7    as a Taurus Model PT 738 pistol.

8    Q    And what was the date?

9    A    This is -- it was signed for on December 7th of 2017.

10   Q    Okay.  And was there an active VPO in effect?

11   A    There was.

12   Q    Let me direct you to Question 11-H.

13        Did Mr. Kaspereit indicate there was or was not a

14   protective order against him at the time?

15   A    He indicated there was not a protective order at this

16   time.

17   Q    Okay.  And the firearms that are listed in this as him

18   purchasing on that date, does the firearms -- same firearms

19   listed in the Indictment?

20   A    Correct.  Yes.

21   Q    Yes.  And did you contact the manufacturer of those

22   firearms?

23   A    I did.

24   Q    And what did they say about the location of

25   manufacturing?

*DIRECT EXAMINATION OF CHAD OUBRE*

1   A    That both firearms were manufactured outside of the state

2   of Oklahoma.

3   Q    Let me direct you to exhibit -- let's see -- Exhibit 10.

4   What is this document?

5   A    This is another report of investigation to document my

6   interview of Stephanie Carson.

7   Q    And did Ms. Carson talk to you about the two guns listed

8   in the Indictment?

9   A    She did.

10  Q    And what did she say about how those came -- what

11  happened to those?

12  A    She recalled that day that her and Mr. Kaspereit were out

13  shopping.  She went to go get her nails done, so they had

14  separated.  He went to the Academy Sports store, purchased the

15  two firearms.

16       And then when they were discussing it at home at a later

17  point, she brought up the fact that he was currently under VPO

18  and asked how he could have purchased the firearms.  He

19  acknowledged that he knew he was under the VPO but said he was

20  going to go ahead and try it anyway.  And they did the

21  background check and sold him the guns.

22  Q    Without going into too much detail, where is the Taurus

23  Judge firearm now?

24  A    It's in law enforcement custody.

25  Q    And, just generally, how did it get into law

1    enforcement's hands?

2    A    During a domestic violence incident in March of 2018.

3    Q    And what happened to Mr. Kaspereit and Ms. Carson after

4    that incident, generally?

5    A    They divorced.

6    Q    Okay.  Did she move away?

7    A    She did.

8    Q    And based on your interview with Ms. Carson, who had the

9    remaining gun?

10   A    She did.

11   Q    Okay.  What happened -- did she tell you about something

12   in October of 2018?

13   A    Yes.

14   Q    All right.  What happened?

15   A    In October of 2018, her -- Ms. Carson and Mr. Kaspereit

16   had been separated, there was an additional VPO that had been

17   filed, and she made an arrangement with Mr. Kaspereit to

18   have -- for him to come to her house to pick up items that

19   belonged to him from her front porch while she was at work.

20        She got a call from Mr. Kaspereit that day stating that

21   he had been in her house.  DHS came to visit, he answered the

22   door from inside the house, and he was calling to inform her

23   of that.  She told him that he needed to leave.

24        Her landlord arrived shortly thereafter because there was

25   some work that was going to be done, and the landlord remained

DIRECT EXAMINATION OF CHAD OUBRE

1  until she got home later that evening, at which point she

2  discovered that this Taurus firearm that we just previously

3  mentioned, as well as her Apple watch, were missing.

4  Q    And was there anything significant about that?

5  A    The Apple watch is significant because it's an item that

6  was -- Mr. Kaspereit, on several occasions, would take from

7  Stephanie during their arguments and fights in order to be

8  able to monitor her text messages and things like that.

9  Q    All right.  And did Ms. Carson report that breaking and

10 entering and theft to law enforcement?

11 A    She did.

12 Q    All right.  So, let's see, we've covered the nature of

13 the offenses.  Let's turn to the history and characteristics

14 of Mr. Kaspereit and some of the details of these incidents

15 and the safety of others.

16     Special Agent Oubre, is it fair to say that you've

17 reviewed a lot of reports prepared between 2015 and 2018?

18 A    That's correct.

19 Q    And those reports are from both law enforcement and DHS?

20 A    Correct.

21 Q    And you've also spoken to Ms. McCormick and Ms. Carson;

22 correct?

23 A    Correct.

24 Q    In general, what has Mr. Kaspereit's employment situation

25 been?

*DIRECT EXAMINATION OF CHAD OUBRE*

```
1            MR. HAMMOND:  I'm sorry?

2   Q    (By Ms. Anderson) Mr. Kaspereit's employment, his job

3   situation.

4   A    I'm unsure of exactly his role.  I know he works in the

5   oil and gas industry.  And to work, he works shifts where he

6   travels out of state for several days at a time and then

7   returns.

8   Q    Do you recall what states he may have been working in?

9   A    Texas and New Mexico.

10  Q    All right.  And does Ms. McCormick now live out of state?

11  A    That's correct.

12  Q    And so let's talk about some of the incidents between

13  Mr. Kaspereit and Ms. McCormick.  Let's go back to Exhibit 7,

14  your report.

15       Did Ms. McCormick tell you about something happening in

16  2011, 2012?

17  A    So when I was interviewing --

18            THE COURT:  Just to make the record clear, I assume

19  you are talking to Brittany Kaspereit?

20            MS. ANDERSON:  Yes.

21            THE COURT:  These are former latter names.

22       I just want to make it clear on the record in case

23  someone's confused with this change of names because of the

24  divorces or whatever.

25            MS. ANDERSON:  Sure.
```

*DIRECT EXAMINATION OF CHAD OUBRE*

1          THE COURT:  Go ahead.  We're talking about two

2     victims.

3          MS. ANDERSON:  That's correct.  If easier, we can

4     refer to Brittany and Stephanie.

5          THE COURT:  Thank you.  That's exactly what I was

6     getting ready to suggest.

7       Go ahead.

8          MS. ANDERSON:  All right.

9     Q    (By Ms. Anderson) So this is an interview with Brittany?

10    A    Correct.

11    Q    All right.  And what did she tell you about 2011, 2012?

12    A    Well, so I had asked her a question.  I had asked if

13    there were any other previous incidents of domestic violence

14    that her and I had not discussed during her interview, at

15    which point she told me about an incident that occurred

16    sometime in 2011 or 2012 where Brittany and Chad were having

17    an argument, he put a gun to her head, threatened to pull the

18    trigger.  And after making this threat, he then put the gun to

19    the floor and fired several rounds into the floor next to her

20    head.

21          THE COURT:  This was 2011 or 2012?

22          THE WITNESS:  Yes, sir.

23          THE COURT:  Go ahead.

24    Q    (By Ms. Anderson) And did she describe or mention other

25    instances of domestic violence?

1   A    She did.  And she also made a comment that he most --

2   most often during these arguments, he would threaten to harm

3   himself.

4   Q    Is that consistent with your review of other reports?

5   A    It is.

6   Q    Including from other people?

7   A    Correct.

8   Q    All right.  Let's go to Exhibit 11.  What is this?

9   A    This is a Stephens County Sheriff's Office incident

10  report that was filed in July of 2015.

11  Q    And who was the reporting party?

12  A    It was Chad Kaspereit.

13  Q    And what was he reporting?

14  A    He wanted to report that there was a -- his wife was

15  intoxicated and on probation and wanted the deputies to calm

16  her down.

17           THE COURT:  So this is the defendant?

18           THE WITNESS:  Yes, sir.

19           MS. ANDERSON:  Right.

20           THE COURT:  Go ahead.

21  Q    (By Ms. Anderson) And while law enforcement was there,

22  did they speak with Brittany?

23  A    They did speak with Brittany.

24  Q    And what did she say?

25  A    During -- when she was speaking with deputies there, she

*DIRECT EXAMINATION OF CHAD OUBRE*

 1   told them that her husband was a horrible person and that he

 2   abuses her.

 3   Q    And what was her emotional state like?

 4   A    She was very highly emotional.

 5   Q    Okay.  And did she ask anything of law enforcement?

 6   A    While law enforcement was there, no arrests were going to

 7   be made.  And when they were going to be separating, she

 8   had -- she requested that one of the deputies go and get her

 9   cellular phone, which was -- which Chad Kaspereit had on his

10   person.

11   Q    And does that seem familiar to you?

12   A    It does.

13   Q    And why is that?

14   A    It was a common theme that I noted in reviewing reports

15   in which Mr. Kaspereit would commonly take items of

16   communication away from Brittany and Stephanie in order to

17   prevent them from being able to communicate with others or to

18   call for help.

19   Q    And was law enforcement able to get her cell phone back

20   to her at this time?

21   A    They were.

22   Q    And did she make some other general statements about how

23   Mr. Kaspereit treats her?

24   A    She routinely would say that he is a horrible person,

25   that he abuses her, that he would hide keys from her so that

*DIRECT EXAMINATION OF CHAD OUBRE*

1    she couldn't escape, things like that.

2    Q    Okay.  Let's turn to Exhibit 12.

3         Just to be clear, that last report was July 2015?

4    A    Correct.

5    Q    All right.  And just --

6         THE COURT:  And just to be clear, I've heard -- or

7    I've seen in some other items of evidence the name Chad

8    Kaspereit.  Is there only one Chad Kaspereit or is there Chad

9    Kaspereit, Jr.?

10        THE WITNESS:  No.  There is only one Chad Kaspereit.

11        THE COURT:  Go ahead.

12   Q    (By Ms. Anderson) All right.  Exhibit 12, what is the

13   date of this report?

14   A    This is August 4th of 2015.

15   Q    About one month later?

16   A    Correct.

17   Q    All right.  And what happened here?  Let me stop you.

18   Who was the reporting party this time?

19   A    Chad Kaspereit was also the reporting party in this

20   incident.

21   Q    Okay.  And what did -- did law enforcement talk to

22   Brittany?

23   A    They did.

24   Q    And what did she say?

25   A    She admitted to slapping Chad during this argument

*DIRECT EXAMINATION OF CHAD OUBRE*

1    because he had called her names.  She also reported that Chad

2    had hit her on numerous occasions in places, quote, hard to

3    see.

4         And then she showed bruises that appeared to the deputy

5    to be of an older age than from that particular day.  Those

6    bruises were located just under her buttocks on the back of

7    her thighs.

8    Q    And did she say whether she had called for help or called

9    law enforcement to assist her?

10   A    She did not.

11   Q    So in that second paragraph on the fourth page of this

12   report, they observed the bruises on her?

13   A    Correct.  She observed -- she didn't call for help, but

14   she said that she was too afraid to call for help, speaking

15   about Chad.

16   Q    And did law enforcement ask Mr. Kaspereit about her

17   bruising?

18   A    They did.  His story to them was that she had fallen down

19   the stairs on two separate occasions landing on the same

20   place.

21   Q    Okay.  Let's turn to exhibit -- and to be clear, all of

22   these incidents happened before any VPO was in place?

23   A    Correct.

24   Q    All right.  Let's turn to Exhibit 13.

25        To orient us in terms of timing, is this the petition

1  that preceded that first emergency VPO in September of 2015?

2  A    It is.

3  Q    And could you flip to pages 3 and 4 and tell us, what did

4  Brittany describe had happened?

5  A    In this petition she describes recurring physical and

6  mental abuse for approximately the previous year, threats to

7  her life, dragging her out of bed by her hair, slamming her

8  face into the wall, pulling her downstairs, throwing her into

9  the pool, grabbing her by the neck.  She also describes

10 Mr. Kaspereit -- Chad Kaspereit shooting into the air.

11         THE COURT:  Do you believe that's the same incident

12 you referred to earlier?

13         THE WITNESS:  No, your Honor.  That's a different

14 incident.

15         THE COURT:  Very well.

16 Q    (By Ms. Anderson) And have you reviewed reports and a

17 criminal probable cause filing against Mr. Kaspereit from

18 September of 2015?

19 A    I have.

20 Q    And are those consistent with this description of events

21 on September 3, 2015?

22 A    It is -- they are, yes.

23 Q    Okay.  So let's turn to Exhibit 14.  Are these reports

24 and statements from that September 3, 2015, incident?

25 A    Yes.  These are the Stephens County Sheriff's Office

1    reports that culminate in the basis for that VPO as well as

2    the charges.

3    Q    Okay.  And the first few pages of this -- of this report,

4    did Brittany want to talk to law enforcement?

5    A    Initially, during this incident, she was very hesitant to

6    talk to law enforcement, saying that she didn't want to say

7    anything bad about her husband.

8    Q    Okay.  Did she repeat that several times?

9    A    She did.

10   Q    Is that consistent with footage you have seen of later

11   incidents with Stephanie?

12   A    Yes.

13   Q    Okay.  And did her nine-year-old son talk to law

14   enforcement?

15   A    He did.

16   Q    And that's the son of Brittany and Mr. Kaspereit;

17   correct?

18   A    Correct.

19   Q    And what did he say?

20   A    During his interview, he had described that his mother

21   and father, Brittany and Chad, were fighting, that Chad had

22   pulled her by the hair and drug her down the stairs.  So he

23   had described that violent encounter.

24   Q    And let's, for a moment, focus on her second written

25   statement, which is further back behind this tab.  It's

1    titled:  "Voluntary Statement," date September 4, 2015.

2    A    Yes.

3    Q    Could you please describe for the Court what, according

4    to Brittany, happened that night?

5    A    So this is a written statement that was provided after

6    the date of the incident, so the next day, provided by

7    Brittany.  And she describes the incident where Chad had been

8    drinking heavily.  She had gone to bed.  She woke up to him

9    vomiting on the floor and also trying to light the -- the

10   dresser on floor -- on fire.

11        He -- at some point during that same time, he had got up

12   and bit her on the ear.  She had gone back to bed where he

13   then grabbed her by the hair, slammed her face into the wall,

14   dragged her down the stairs by her hair, brought her out to

15   the backyard, throw her -- threw her into the pool.

16        When she tried to get out of the pool, he grabbed her by

17   the neck, threw her back into the pool.  Then he grabbed a gun

18   and began to fire rounds into the air.  Walked into the

19   backyard and saying things like he's just going to kill

20   himself and you and the kids are better off without me.  Then

21   he laid on the ground fired more shots up into the air.

22        She eventually went back upstairs to lay down, and he

23   came back over to her after she laid down in the bed, tapped

24   the gun onto her head and said, "Don't underestimate me.  If I

25   can't have them, no one can.  I can do both of us."

1    Then he pushed her to the ground, choked her, at which

2   point her son tried to intervene with a phone so that they

3   could call for help.  Chad attacked the son, throwing him to

4   the ground causing injury.

5   Q    Did he actually pick the son up by the neck and throw him

6   to the ground?

7   A    Correct.

8   Q    And in an earlier report, did Brittany say something to

9   Chad about that as it was happening?

10  A    She did.  She said, You're hurting him, or some- -- He's

11  hurt, something to that effect.

12       And Chad's response was, Oh, well.

13  Q    Okay.  And according to Brittany, did the -- maybe in the

14  earlier statements, did the five-year-old daughter also get

15  involved?

16  A    Yes.  She witnessed this and made a statement that she

17  saw the fight.

18  Q    Okay.  In that previous written statement on

19  September 3rd, there's some redactions there.

20       Are you able to tell -- the five-year-old getting

21  involved in the physical altercation?

22  A    I'm sorry.  What was the question?

23  Q    So a couple of pages earlier from the Stephens County

24  Sheriff's Office statement form, September 3, 2015, the very

25  bottom of that first page.

*DIRECT EXAMINATION OF CHAD OUBRE*

1   A   Okay.  Yes?

2   Q   We can skip it.

3   A   Okay.

4   Q   All right.  Now, there are more extensive law enforcement

5   reports that precede this voluntary statement.

6       Do those reports describe physical evidence collected and

7   observed by law enforcement?

8   A   Yes, there was.

9   Q   And what sort of physical evidence did they find?

10  A   They found hair that had been pulled from Brittany's head

11  that was located in the house.  They found women -- wet

12  women's clothing that was on the ground just outside the pool.

13      They found blood that was located outside as well as

14  eight 9-millimeter shell casings that were located outside.

15  Q   Okay.  Did they find a firearm?

16  A   They did.

17  Q   And where was that located?

18  A   Under a cushion outside -- under a seat cushion.

19  Q   Okay.  And did they -- she had described her head going

20  into a wall, you mentioned earlier.

21  A   Correct.

22  Q   Did they find any evidence of that?

23  A   They did.  There is photographs that showed the location

24  of the hole in the wall, and you could see damage to the

25  Sheetrock, which is located just above the bed in the bedroom.

*DIRECT EXAMINATION OF CHAD OUBRE*

1   Q     And are some of those photos included here?

2   A     Yes.

3         Okay.

4               THE COURT:  While we're on this subject, do you have

5   knowledge of any children that the defendant and Brittany had

6   together?

7               THE DEFENDANT:  Yes, sir.  The two children that

8   were involved in this incident.

9               THE COURT:  What were their names?

10              THE WITNESS:  I don't recall their names, your

11  Honor.

12              THE COURT:  Would it be Richard and Tim, by any

13  chance?

14              THE WITNESS:  No, sir.  I don't believe -- that's

15  not their children.

16              THE COURT:  That's not the right names?

17        Go ahead.

18              MS. ANDERSON:  For -- I've redacted it to comply

19  with --

20              THE COURT:  I understand.

21              MS. ANDERSON:  -- 3509.

22              THE COURT:  I just had other information regarding a

23  Tim Carson and a Richard Carson.  I was interested --

24              MS. ANDERSON:  I believe that --

25              THE COURT:  -- seeing if that's where it connected

*DIRECT EXAMINATION OF CHAD OUBRE*

1    at.

2              MS. ANDERSON:  I believe we can get to that.

3              THE COURT:  I anticipate --

4              MS. ANDERSON:  Would you like for us to jump now?

5              THE COURT:  -- I anticipate it.  Go ahead.

6              MS. ANDERSON:  Okay.  All right.

7    Q    (By Ms. Anderson) Just for a quick jump for initials, if

8    you go to Exhibit 24, the first page of the DHS report that

9    needs more redactions, are those initials of three children

10   shared by Brittany and Chad?

11   A    Correct.

12   Q    Okay.  And do those initials relate to the same children

13   who were involved in the incident on September 3, 2015?

14   A    Yes.

15   Q    Okay.  All right.  So we just talked about the physical

16   evidence.

17        What kind of firearm was it in September of 2015?

18   A    It was a Taurus 9-millimeter.

19   Q    Okay.  And to connect things, is -- the Exhibit 1

20   emergency VPO was entered right after this incident; is that

21   correct?

22   A    Correct.

23   Q    And were there criminal charges filed against

24   Mr. Kaspereit?

25   A    There were.

*DIRECT EXAMINATION OF CHAD OUBRE*

1  Q    And what happened to those charges?

2  A    They were -- ultimately, they were expunged.

3  Q    At some point was he on probation?

4  A    Yes.

5  Q    Okay.  And --

6           THE COURT:  Excuse me.  For what?

7           THE WITNESS:  Charges -- domestic violence charges

8  related to this incident that we just described.

9           THE COURT:  Felonies or misdemeanors, if you recall?

10          THE WITNESS:  I don't recall if they were felony or

11  misdemeanor, your Honor.

12          THE COURT:  He was, I assume, given a deferred

13  sentence; is that correct?

14          THE WITNESS:  He was on some sort of probation and

15  then they were expunged, so I haven't been able to get the

16  details of exactly the conviction or the --

17          THE COURT:  You're not sure if it was a deferred

18  prosecution agreement or a matter before the Court?

19          THE WITNESS:  Correct, your Honor.

20  Q    (By Ms. Anderson) And if you'll turn back behind her

21  statement, is that the probable cause affidavit that was filed

22  against Mr. Kaspereit?

23          THE COURT:  Help me with -- what exhibit?

24  Twenty-four still?

25          MS. ANDERSON:  We are on 14.

*DIRECT EXAMINATION OF CHAD OUBRE*

```
 1              THE COURT:  Fourteen?

 2              MS. ANDERSON:  Yes.

 3              THE WITNESS:  Yes.  This is a probable cause

 4    affidavit filed in Stephens County for all the charges related

 5    to that incident, which the charges that were filed based on

 6    this affidavit were domestic assault and battery by

 7    strangulation and domestic assault and battery by

 8    strangulation on a minor.

 9              THE COURT:  Now -- and I hate to interrupt again,

10    but I want to make sure I get this in sequence.

11         How long was he on probation or deferred prosecution

12    agreement?  Since the time of the incident, how much

13    transpired until it was expunged?

14              THE WITNESS:  I'm unclear on that, your Honor,

15    because it's all been expunged.

16              THE COURT:  Well, but since the date of the alleged

17    incident, that would be --

18              MS. ANDERSON:  I believe we can get to it.

19              THE COURT:  Well, let me ask him.

20              MS. ANDERSON:  Yes.

21              THE COURT:  September 3, 2015, since that day until

22    the date it was expunged, how long a term was that?

23              THE WITNESS:  Your Honor, I don't know exactly how

24    long that term was.  It's been very unclear in trying to

25    figure out through these reports exactly when things were
```

```
 1    expunged and how.
 2              THE COURT:  But you have the date it was expunged.
 3              THE WITNESS:  I actually haven't seen the date.
 4    Only in reports where it says that it was expunged.
 5              THE COURT:  So for all you know, it was expunged two
 6    months ago.
 7              THE WITNESS:  Correct.  I do not know, your Honor.
 8              THE COURT:  All right.
 9         Go ahead.
10    Q    (By Ms. Anderson) If we go to the first page of
11    Exhibit 17.  Jump ahead a little bit.
12    A    Correct.  This is what I was referring to, your Honor.
13         So in law enforcement reports --
14    Q    So at the bottom of this page, does it mention an
15    expungement order?
16    A    Correct.  It says:  Expunge order, 8/2/17.  Expunged then
17    10/12/17.  Again, this is in a law enforcement report, an
18    Oklahoma City Police Department report.
19              THE COURT:  What does that mean to you, if anything?
20    Or are you afraid of giving an opinion?  I know what I think
21    it meant.  I was a judge for 15 years in state court.  But I
22    would rather hear your opinion.
23              THE WITNESS:  Honestly, your Honor, this is the
24    first time I have ever seen in a police report that it says
25    something like this, that something was expunged.  I have
```

1    never seen that in a police report before.

2              THE COURT:  Fair enough.

3    Q    (By Ms. Anderson) All right.  After this -- we're at

4    September 3, 2015.  Then did Brittany file for divorce?

5    A    She did.

6    Q    All right.  And have you reviewed any -- let's see --

7    reports or other records related to violations of that VPO?

8    A    I have.

9    Q    All right.  Could you turn to Exhibit 15, please.  What

10   is contained in this exhibit?

11   A    This exhibit contains multiple reports related to

12   violations of that victim protection order pertaining to Chad

13   Kaspereit and Brittany.

14   Q    All right.  And is it fair to say this is some but not

15   all?

16   A    Correct.

17   Q    And what types of violations of that VPO occurred?

18   A    So this is a culmination of reports where there are

19   independent witnesses that see Chad Kaspereit approaching the

20   witness where -- or approaching Brittany.

21         He is reported to be following her in multiple vehicles,

22   sending text messages to her, both from his own phone as well

23   as from his dad's phone, making threatening and harassing text

24   messages, things like that.

25   Q    Okay.  Has -- are they in reverse chronological order?

*DIRECT EXAMINATION OF CHAD OUBRE*

1    A     Yes.

2    Q     Okay.  And let's start with the first one in here, the

3    most recent.  Could you describe what this report is about?

4    A     This was reported on August 25th of 2017.  This is a

5    point in which officers were dispatched and where they had

6    gotten a report that there was a female subject living at this

7    location that was intoxicated and about to drive her children

8    to school.

9          When the officers arrived there, they made contact with

10   Brittany.  And during their interview with Brittany and the

11   subsequent investigation there on the scene, they determined

12   that she had no signs or indications that she was intoxicated.

13         And Brittany explained to the officers there that this

14   was a common tactic with her ex-husband, Chad Kaspereit, where

15   he calls and makes false police reports in an attempt to

16   harass her.

17   Q     All right.  Have you reviewed other police reports where

18   that is the case?

19   A     Correct.  Yes, I have.

20   Q     What about DHS reports?  Are there -- have you reviewed

21   DHS reports in which Chad Kaspereit has reported things to DHS

22   and accused Brittany of doing things?

23   A     Correct.  And then there are times in which those end up

24   being investigated and found to be unfounded.

25              THE COURT:  Is -- August of 2017, when there was

*DIRECT EXAMINATION OF CHAD OUBRE*

1   this incident regarding the dispatcher being informed someone

2   was intoxicated, is that the most recent occurrence or have

3   there been more recent occurrences?

4          THE WITNESS:  That's the most recently documented

5   occurrence between Chad and Brittany.

6          THE COURT:  Thank you.

7   Q   (By Ms. Anderson) All right.  And could you describe

8   generally some of the other reports, the frequency of them?

9   A   The frequency is -- so the VPO was filed in September,

10  and then between that September and the following March, there

11  is at least one and up to three incidents per month every

12  month up until March.

13  Q   All right.  So if we turn to that next report, is

14  there -- in the third paragraph, is there a date for that

15  instance?

16  A   This would be under the facts and circumstances.  It

17  says:  On February 2, 2016, Brittany was reporting the

18  violation of her protective order.

19  Q   And if we jump to the third paragraph?

20  A   It says that on September 9th, Chad followed her --

21  meaning Brittany -- and her three children from Tucker Road

22  and Highway 7 to the Walmart parking lot in Duncan.

23  Q   Okay.  When was the next one?

24  A   September 10th.

25  Q   And when was the next one?

DIRECT EXAMINATION OF CHAD OUBRE

1    A    September 12th.

2    Q    And when was the next one?

3    A    September 17th.

4    Q    And the next?

5    A    September 26th.

6    Q    Okay.  And you mentioned that there were also reports by

7    other individuals other than Brittany.

8    A    Correct.

9    Q    And did law enforcement verify some of these violations?

10   A    They did.  They got written statements from these

11   witnesses.

12   Q    All right.  And on any of the occasions when Brittany

13   called law enforcement, did law enforcement show up?

14   A    They did.

15   Q    And did they find Mr. Kaspereit in the place that he was

16   reported being?

17   A    Yes.

18   Q    Let's go to -- so this is -- we've talked about

19   violations of the VPO that had been entered in September of

20   2015, per timestamp here.

21        Back to Exhibit 8, when was the divorce finalized?

22   A    The divorce decree was finalized and filed on September

23   23, 2016.

24   Q    Okay.  And then are you familiar with an incident alleged

25   to have occurred in October of 2016?

*DIRECT EXAMINATION OF CHAD OUBRE*

1  A    Yes.

2  Q    Okay.  Who was involved in that one?

3           THE COURT:  Say the date again.

4           MS. ANDERSON:  October 2016.

5           THE COURT:  Okay.

6      Go ahead.

7           THE WITNESS:  So it --

8  Q    (By Ms. Anderson) And I can direct you to Exhibit 16.

9  A    Okay.  So this is a photograph and it's of a picture of

10 Stephanie's right knee, and so she explained this incident to

11 me during an interview.

12     And this was an incident that was previously -- or at the

13 time of this incident not reported to law enforcement where

14 her and Chad had been in an argument.  And during that

15 argument, Chad was waiving -- had a firearm, was threatening

16 to --

17          THE COURT:  Okay.  I want to make sure I understand

18 your line of questioning.  You referred me to a dissolution of

19 marriage that involved Brittany and Chad --

20          MS. ANDERSON:  Uh-huh.

21          THE COURT:  -- in 2016.  And now we've gone to an

22 exhibit that shows entries that he says are with Stephanie.

23          MS. ANDERSON:  Correct.  The next month.

24          THE COURT:  Okay.  Just connect it up.

25          MS. ANDERSON:  Yes.  So we've transitioned from

*DIRECT EXAMINATION OF CHAD OUBRE*

1   talking about Brittany to now talking about Stephanie.

2          THE COURT:  Okay.

3          MS. ANDERSON:  All right.

4   Q   (By Ms. Anderson) So this exhibit on page 16 -- or on

5   Exhibit 16, when was this photo taken?

6   A    This photo was taken in March -- March or April of 2018,

7   during an interview with law enforcement.

8   Q    Okay.  But Stephanie said this injury happened in October

9   of 2016?

10  A    Correct.

11  Q    And so if you turn to, for your reference, Exhibit 21, is

12  that one instance where she describes how this injury came to

13  be?

14  A    Yes.  This is an Oklahoma City Police Department report.

15  And in this is a documentation of an interview between

16  Stephanie and a detective.

17  Q    Okay.  And she also mentioned this to you, did you say?

18  A    Correct.  She, in general, mentioned this to me when we

19  were on the phone.

20  Q    All right.  And did she also report it to DHS at some

21  point?

22  A    She did.

23  Q    Okay.  What did she describe had happened in October of

24  2016?

25  A    She described it as an argument between her and Chad.

DIRECT EXAMINATION OF CHAD OUBRE

1    Chad had a firearm, was threatening to harm himself, was on

2    his knees, and she believed that was a time when she could

3    escape.  She attempted to run away.

4        He tackled her.  When he tackled her, she struck her knee

5    on the ground and, quote, shattered it, which resulted in the

6    scar that's on her knee.

7    Q    And based on your review of law enforcement reports, was

8    there any report filed with law enforcement in October of

9    2016?

10   A    I don't believe so, no.

11   Q    Okay.  And why was that?

12   A    She was too afraid to contact law enforcement.

13   Q    All right.  And did he have any reasons why she should

14   not contact law enforcement at that time?

15   A    He had begged her not to and said because he was

16   currently on probation, is what she explained in the

17   interview.

18   Q    Okay.  Is it fair to say that in October of 2016, there

19   was an active VPO in place?

20   A    Correct.  There was.

21   Q    Okay.  And this instance involved a gun --

22   A    Correct.

23   Q    -- with Stephanie?

24   A    Correct.

25   Q    Let's turn to Exhibit 17.  So we go from October of 2016

1   to now June of 2017.  What happened in early June 2017?

2   A    This is an Oklahoma City Police Department report in

3   which it has Chad Kaspereit listed as a victim and Stephanie

4   Carson -- Stephanie Kaspereit listed as a suspect.

5        In this incident, Chad Kaspereit was the caller, and he

6   had called to report that he was the victim of domestic

7   violence at the hands of Stephanie.  When officers arrived and

8   they conducted an interview with Stephanie, she relayed to

9   officers that -- about an ongoing and continual rape that was

10  occurring at the hands of Chad Kaspereit, specifically one

11  that had occurred the day prior, so June 3, 2017.  And that

12  culminated in her being taken for a SANE exam.

13  Q    And did she explain whether that was the first time it

14  had happened?

15  A    She explained that it actually had been going on for

16  approximately the previous year on about a daily occurrence.

17  Q    And could you describe a little more about what she said

18  had happened?

19  A    So the way she had described it is that approximately

20  2:00 in the morning that -- on June 3rd, that they had had

21  consensual sex but then later that -- at around 9:00 in the

22  morning, Chad wanted to have sex again, which she declined.

23  He became very upset about it, forced himself on her, moved

24  her shorts and -- forced her onto the bed, moved her shorts to

25  the side, and raped her.

*DIRECT EXAMINATION OF CHAD OUBRE*

1  Q     And did she receive a SANE exam?

2  A     She did.

3  Q     Okay.  And what did Mr. Kaspereit tell law enforcement

4  had happened?

5  A     He stated that they had gotten into an argument and that

6  culminated in Stephanie being, you know, pushed outside into

7  the garage and that she had gone around and was beating on a

8  window with a board trying to get back into the house.

9        That was Chad Kaspereit's story of -- version of what

10 culminated and the police being called there.

11 Q     And did she explain why or whether she had beat on the

12 window with a board?

13 A     She did.  She admitted that she had.  And the story that

14 she gave was that Chad had thrown her outside and locked her

15 out into the garage, but her daughter was still inside, so she

16 was trying to get to her daughter who was still inside the

17 house.

18 Q     And that's a daughter from Mr. Kaspereit or a previous

19 relationship?

20 A     I believe it's a previous relationship.

21 Q     Okay.  And about how old was that child?

22 A     I believe she was somewhere around seven at the time.

23 Q     Okay.  And is it fair to say that in June 2017, there was

24 an active VPO in place at the time?

25 A     There was.

*DIRECT EXAMINATION OF CHAD OUBRE*

1   Q    Okay.  Let's go back to Exhibit 10 just to be

2   chronological.  So we've gone from June 4, 2017.

3        Did Stephanie mention anything else that happened in the

4   summer of 2017?

5   A    Stephanie described that, in the summer of 2017, Chad

6   had, quote, hacked into her Amazon account and made several

7   purchases of items from her Amazon account and had those items

8   shipped to his address and even had signed for at least one of

9   those items.

10  Q    Okay.  And had they broken up at that point?

11  A    Yes.

12  Q    And did she report that to law enforcement?

13  A    She eventually did, yes.

14  Q    And let's go to Exhibit 18.  Do you recognize this

15  document?

16  A    Yes.  It's a 911 call log from Oklahoma City.

17  Q    All right.  Have you listened to the recording of this

18  phone call?

19  A    I have.

20  Q    And who is making the call to 911?

21  A    This is Stephanie making this call.

22  Q    Okay.  And you've listened to the call.  Is it consistent

23  with this report?

24  A    It is.

25  Q    All right.

*DIRECT EXAMINATION OF CHAD OUBRE*

1              MS. ANDERSON:  Your Honor, may I play the call?

2              MR. HAMMOND:  What exhibit number are we on, your

3    Honor?

4              THE COURT:  Eighteen.  And I'm still looking for the

5    date.

6         What date are you referring to, Ms. Anderson?

7              MS. ANDERSON:  This is November 17 --

8              THE COURT:  November 17, 2017?

9              MS. ANDERSON:  Yes.

10             THE COURT:  The call occurred approximately -- was

11   at 10:45 at night?

12             MS. ANDERSON:  Correct.

13             MR. HAMMOND:  I'll leave it to the Court's

14   discretion, your Honor, if you want to --

15             THE COURT:  Well --

16             MR. HAMMOND:  -- I think the report speaks for

17   itself.

18             THE COURT:  I have no problem -- I want to give you

19   wide latitude, Ms. Anderson, because you have the burden.  I

20   want you to make sure -- I want you to give me about 30

21   seconds of connecting these things up with my primary concerns

22   to date.

23             MS. ANDERSON:  Yes, your Honor.  So --

24             THE COURT:  And that is, is he a risk of flight?  Is

25   he a danger to the community?

*DIRECT EXAMINATION OF CHAD OUBRE*

1          Now, I want to make it clear that I assume you're going

2     to connect all of these things up to the present --

3               MS. ANDERSON:  Yes, your Honor.

4               THE COURT:  -- that would give me a reason to

5     believe that he's a danger to himself or other people; is that

6     correct?

7               MS. ANDERSON:  That is correct.

8               THE COURT:  Okay.  I will anticipate that.  Go

9     ahead.

10              MS. ANDERSON:  Yes.

11              THE COURT:  You may play that.

12         (Government's Exhibit 18 attempted to be played for the

13    Court, after which the following proceedings transpired:)

14              THE COURT:  A little louder, I'm afraid.

15         It's not coming across.

16              MS. ANDERSON:  It's not picking it up.

17              THE COURT:  We have this recorded by the court

18    reporters that are going to kill me for letting you do this.

19              MS. ANDERSON:  All right.  Well --

20              THE COURT:  If you want to make a -- let me find at

21    this time that there is not sufficient quality for there to be

22    an understanding by the Court as to what was related, and also

23    the recording devices and the Court should not be expected to

24    have replicated it.

25              MS. ANDERSON:  Okay.

DIRECT EXAMINATION OF CHAD OUBRE

1          THE COURT:  If you make a summary, I would be glad
2    to hear it.
3          MS. ANDERSON:  Sure.
4    Q    (By Ms. Anderson) I will ask, Special Agent Oubre, could
5    you describe what you hear in this audio?
6    A    It's –– the woman making this phone call is sobbing.  She
7    is frantic.  Sounds like a child she is so afraid.  She makes
8    statements about how she thinks her husband –– and names him,
9    Chad Kaspereit –– is going to kill her.
10          The dispatcher asks if they want –– if she wants a police
11    response, and she says, no, I don't know if he is watching.
12    And if he sees cops here, he'll kill me.
13    Q    And did she repeat that several times?
14    A    Yes.
15    Q    Does the 911 dispatcher try to convince her to let the
16    police come?
17    A    Yes.  She tries for a while to convince her to let the
18    police come, and she continually declines.
19          THE COURT:  So –– okay.
20    Q    (By Ms. Anderson) And does ––
21          THE COURT:  So she called 911 and then didn't ask
22    for help ––
23          THE WITNESS:  Correct.
24          THE COURT:  –– for whatever reason.
25          THE WITNESS:  She wanted to know what to do.  She

*DIRECT EXAMINATION OF CHAD OUBRE*

1    kept asking what to do.  And they offered police response, but

2    she was too scared of the police response.

3              THE COURT:  Go ahead.

4    Q    (By Ms. Anderson) Are you able to hear other dispatchers

5    in the background?

6    A    Yes.

7    Q    And what are they doing?

8    A    They're all very upset and just frantic about the

9    situation.

10   Q    And at some point does it just turn to dead air?

11   A    It does.

12             THE COURT:  I'm sorry.  Do what?

13             MS. ANDERSON:  It turns to dead air.

14             THE COURT:  Okay.  So someone hangs up?

15             THE WITNESS:  Correct.

16             THE COURT:  Do you know who?

17   Q    (By Ms. Anderson) Do you hear the 911 dispatcher asking?

18   A    Oh, it's definitely the caller that ends the phone call,

19   because the 911 dispatcher continues to try and get ahold of

20   her for a period of time.

21             THE COURT:  And I'm going to let you inquire all you

22   want, but for my purpose, to simplify what I want to hear,

23   based on your investigation, did anything else happen as a

24   result of this?

25             THE WITNESS:  No, sir.  There was no --

1          THE COURT:  Was there any further investigation?

2    Were there any criminal charges brought?

3        Did the police go out to see the lady?  Did they try to

4    trace the source of the call?

5        Did anything happen other than what you've just said?

6          THE WITNESS:  I've been able -- unable to locate any

7    other documentation of it.

8          THE COURT:  Okay.

9        Go ahead.

10   Q    (By Ms. Anderson) Did you look to see whether there were

11   any law enforcement contacts or reports generated or any

12   service calls sent out?

13   A    I did.

14   Q    And did you find anyone who went there?

15   A    No.

16   Q    Okay.  So that was dated November 17, 2017 --

17   A    Correct.

18   Q    -- correct?

19        Was there a VPO in place at the time?

20   A    Yes.

21   Q    Okay.

22          THE COURT:  Is that the last incident that the

23   defendant has had with Stephanie?

24        Is that the most recent situation between Stephanie and

25   the defendant?

*DIRECT EXAMINATION OF CHAD OUBRE*

```
1              THE WITNESS:  I don't -- I don't believe so.
2              THE COURT:  Go ahead.
3    Q    (By Ms. Anderson) All right.  After -- so there's a VPO
4    in place still from Brittany at this time; correct?
5    A    Correct.
6    Q    And this is November of 2017.  I'm going to direct you to
7    Exhibit 21, which is a later interview report.
8         Are you familiar with an event described to be on
9    December 3, 2017?
10   A    Yes.  I recall that incident, yes.
11   Q    And have you seen it reported in various locations?
12   A    I have.
13   Q    And, in general, what happened on December 3, 2017?
14   A    So Stephanie and Chad had an argument.  He got upset with
15   her and pulled her out of the bed by her feet and ripped her
16   shorts off to prevent her from being able to leave, accused
17   her of being a cheating whore, slapped her on the top of the
18   head, and he made statements that if she's not having sex with
19   him, then she must be having sex with someone else because he
20   has to have sex every day.
21   Q    Okay.  And if you keep going, did he pull her by the
22   hair?
23   A    He drug her by the hair out into the garage, threw her
24   outside, locked the door so that she couldn't get back in.
25   Eventually ends up back out there with her, strangles her to
```

*DIRECT EXAMINATION OF CHAD OUBRE*

1   the point where she felt like she was going to pass out and

2   her face was turning red and she couldn't breathe.  And to

3   escape, she had to grab him in the groin in order to break the

4   hold.

5   Q    And was -- did she have physical injuries -- visible

6   injuries after that incident?

7   A    Yes.  She had bruises on her neck.

8   Q    And did she feel pain around her throat afterwards?

9   A    She did.

10  Q    Okay.  And did others observe those bruises?

11  A    Yes.  She went the next day to see her sister, Mindy

12  Hurst, who observed the injuries on her neck.

13  Q    Okay.  And law enforcement interviewed her sister and

14  she --

15  A    -- corroborated that, yes.

16  Q    And what did Mr. Kaspereit do after that December 3rd

17  strangling incident?

18  A    As an apology, he bought her a car.

19  Q    What kind of car?

20  A    It was a Jeep.

21  Q    Okay.

22        THE COURT:  Again, since we're on the subject, did

23  the police -- did any -- did anyone ever bring a charge or

24  allege a violation of the protective order?

25        THE WITNESS:  Not for that particular incident, no,

*DIRECT EXAMINATION OF CHAD OUBRE*

1    sir.

2              THE COURT:  Go ahead.

3    Q    (By Ms. Anderson) All right.  So that is December 3rd of

4    2017?

5    A    Correct.

6    Q    We saw earlier Exhibit 9, the purchase of the firearms.

7    When did that happen?

8    A    That was December 7, 2017.

9    Q    Okay.  VPO still in place?

10   A    Correct.

11   Q    All right.  Let's turn to Exhibit 19.

12        You said December 4, he bought her a Jeep Grand Cherokee?

13   A    Correct.

14   Q    December 7th, he bought the Taurus Judge firearm;

15   correct?

16   A    Correct.

17   Q    All right.  What happens on December 22, 2017?

18   A    This time Chad calls to make a report of a stolen

19   vehicle.  He tells police that his Jeep was stolen, doesn't

20   know anything about why it might be stolen, and reports that

21   his Taurus revolver is present in the Jeep and is also stolen.

22   Q    Okay.  Who had that Jeep at the time?

23   A    Stephanie did.

24   Q    Stephanie did?

25   A    Correct.

*DIRECT EXAMINATION OF CHAD OUBRE*

1  Q    And so he reported the Jeep that he gave her --

2  A    Correct.

3  Q    -- stolen?

4       All right.  And how do you know that it was the Judge --

5  the Taurus Judge revolver he had purchased on December 7th?

6  A    He provided the serial number.

7  Q    Okay.  And he reported to law enforcement the theft of

8  his gun and Jeep?

9  A    Correct.

10 Q    Okay.  And there was a VPO in effect at this time?

11 A    Correct.

12 Q    Then for the purpose of our timeline, that VPO is

13 dismissed February 26, 2018?

14 A    Correct.

15 Q    Okay.  Between -- after February 26, 2018, when there is

16 no VPO in effect -- let's turn to Exhibit 20.  What is this?

17 A    This is the VPO filed by Stephanie on March 19th of 2018.

18 Q    Okay.  And for context, is this the petition associated

19 with that second VPO --

20 A    Correct.

21 Q    -- that was back in Exhibit 5?

22 A    Correct.

23 Q    And on page 3 and 4, what does Stephanie describe as the

24 incident that caused the filing of this VPO?

25 A    That Chad had threatened her with the Judge .45.  She

*DIRECT EXAMINATION OF CHAD OUBRE*

1  puts in her statement he also threatened Tim Carson and

2  Richard Carson, which are family members of Stephanie.

3      That -- she reported that he removed -- he meaning

4  Chad -- removes fuses from her car to prevent her from

5  leaving.

6      He breaks her phones to prevent her from calling for

7  help.  He has urinated on her child's clothes, bed, shoes, and

8  destroyed her child's room.

9      He also stated that, quote, he would bury Stephanie and

10  the children.  He pulled Stephanie's hair and drug her around

11  as well as pushing her down and throwing her to the ground as

12  well as feeding her two small dogs laxatives.

13  Q    All right.  And the next case, does it describe any other

14  -- she described previous instances -- those were all -- I'm

15  sorry.

16      If you go to that third page, what date does she say that

17  incident all happened?

18  A    This is March 16, 2018.

19  Q    Okay.  So March 16, 2018.  And then two pages over, does

20  she describe previous incidents?

21  A    These are previous incidents where he turns off the

22  breakers in the house, that Stephanie and one of her children

23  were home, he choked, slapped, pushed, and pulled Stephanie

24  Kaspereit's hair, as well as harassing her family member, Tim

25  Carson.

DIRECT EXAMINATION OF CHAD OUBRE

1    Q    Okay.  And let's go to Tab 21.

2              THE COURT:  We need to start moving along.  Let's

3    go.

4              MS. ANDERSON:  Yes.

5    Q    (By Ms. Anderson) Are these reports associated with that

6    March 16, 2018 event?

7    A    Yes.

8    Q    And it also -- these include descriptions of earlier

9    events from Stephanie --

10   A    Correct.

11   Q    -- that we've already discussed?

12   A    Correct.

13   Q    Okay.  Did you also watch body cam footage, review

14   photos, and other things?

15   A    I did.

16   Q    All right.  Let's turn to the -- so one, two, three,

17   four, five, six, seven, eight -- ninth page of this.

18        Did she describe anything happening in the days preceding

19   this?

20   A    It describes unhooking the battery cables to her vehicle

21   to prevent her from leaving as well as the 911 call to -- the

22   911 call describing the vehicle, and she was afraid that

23   somebody was going to leave.

24   Q    Okay.  Let's go -- there's a -- page 4 at the top, the

25   second paragraph says:  On Monday, 3/12/18.

*DIRECT EXAMINATION OF CHAD OUBRE*

1    A    I was looking at a page at the top right-hand corner was

2    page 9.  Is that not what you are --

3              MS. ANDERSON:  May I approach, your Honor?

4              THE COURT:  Is this about the syringes?

5         Just draw his attention to it, please.

6    Q    (By Ms. Anderson) Did she describe something happening on

7    March 12th?

8    A    Yes.  She was trying to leave town.  Chad was driving,

9    driving erratically.  They ended up separating out of the car.

10   And she saw in that car that there was a bag full of syringes

11   in it.

12   Q    Okay.  And did he then shatter the windshield?

13   A    Yes.  He threw something through the windshield causing

14   it to shatter.

15   Q    All right.  Strangled her with the seatbelt?

16   A    Yes.

17   Q    All right.  Let's go a couple days later, which on the

18   next --

19             THE COURT:  Let me try to summarize this.

20        From your investigation, do you believe that information

21   is something that is relevant to what's concerning the Court

22   today?

23             THE WITNESS:  I do, your Honor.

24             THE COURT:  Tell me why.

25             THE WITNESS:  Because this -- all of these reports

1    go to a long-standing pattern of violence against these two

2    women, extraordinary violence that's ongoing and in violation

3    of multiple protective orders at multiple times during those

4    protective orders.

5         His common habit of possessing firearms while under

6    victim protections order, using those firearms to threaten

7    himself and to threaten his wife and loved ones, as well as

8    their children, it definitely goes to show this is a common

9    theme in Mr. Kaspereit's life.

10              THE COURT:  Go ahead.

11   Q    (By Ms. Anderson) Okay.  The main --

12              THE COURT:  And the purpose of the syringes, you are

13   saying -- you would suggest to the Court he was on steroids

14   and the steroid had some contributing factor to his agitated

15   states?  Is that fair?

16              THE WITNESS:  Yes, your Honor.

17              THE COURT:  Go ahead.

18              MS. ANDERSON:  Yes, your Honor.

19   Q    (By Ms. Anderson) There is one part that I think is not

20   otherwise before the Court so I want to bring you to two pages

21   over, page 6.

22              THE COURT:  What exhibit are we on?

23              MS. ANDERSON:  Same one.  This is Exhibit 21.

24   Q    (By Ms. Anderson) After she has gone to the nail -- there

25   were more instances that happened between March 12th and the

1   final instance.  But here is something after she goes to the

2   nail place.  Could you tell us what happened?

3   A    Yes.  So the long-standing multi-day argument and fight,

4   they end up back at the home.  Chad grabs her -- Stephanie by

5   her hair, pushes her towards Stephanie's daughter rooms --

6   daughter's room and tells her, quote:  I am going to kill you

7   in here so when your daughter comes home she will find her

8   mom's body in her room.  That will really fuck her up.

9        Stephanie said that when they got into the room, she saw

10   that Chad had already placed his gun in that room on a white

11   table.

12            THE COURT:  What date was this again?  March 16,

13   2018, or a different date?

14            THE WITNESS:  This occurred on one of the -- shortly

15   prior, but it got reported to law enforcement during an

16   interview culminating from that March 16th incident.

17            THE COURT:  Is it fair to say that is the most

18   recent incident involving the defendant and Stephanie?

19            THE WITNESS:  Most recent violent incident, yes.

20            THE COURT:  Go ahead.

21   Q    (By Ms. Anderson) All right.  And had he also burned her

22   clothing?

23   A    Yes.  Her burned some of her clothing in a trash can.

24   Q    All right.  Urinated on the seven-year-old's --

25   A    -- clothing.

*DIRECT EXAMINATION OF CHAD OUBRE*

1  Q    -- clothing, shoes, bed?

2  A    Yes.

3  Q    And are there other details about that incident --

4  A    There are.

5  Q    -- that are throughout these reports?

6  A    Correct.

7  Q    Okay.  And was Mr. Kaspereit interviewed about these

8  events?

9  A    He was.

10  Q    Did law enforcement observe bruises or injuries

11  consistent with Stephanie's version of the events?

12  A    They did.

13  Q    All right.  And was Mr. Kaspereit asked about those

14  injuries?

15  A    He was.

16  Q    Did he have an explanation?

17  A    He stated that Stephanie likes rough sex, which was the

18  cause of the bruising.

19  Q    And did he claim to have videos exonerating him?

20  A    He did.  And he showed those videos and photographs to

21  the detective, who determined that they either weren't related

22  or didn't exonerate him in any way.

23  Q    Okay.  And did officers find hidden cameras at the

24  residence?

25  A    They did.

DIRECT EXAMINATION OF CHAD OUBRE

1   Q    All right.  And from -- have you reviewed the body cam

2   footage from this incident?

3   A    Yes.

4   Q    And what is your takeaway from that?

5   A    It was obvious on that instance that very quickly, even

6   though Chad Kaspereit was the reporting party, the officers

7   didn't believe his version of the story as well as --

8            THE COURT:  What is that?

9            MS. ANDERSON:  That was my computer shutting off.

10           THE WITNESS:  -- as well as Stephanie Kaspereit

11  being hesitant to provide a story to law enforcement until

12  Chad was ultimately placed in custody and removed from the

13  scene, at which point she was willing to talk.

14  Q    (By Ms. Anderson) And there was a firearm involved in

15  that?

16  A    There was.

17  Q    And if you flip through, are there photos of that firearm

18  in here?

19  A    Yes.  There were several firearms actually located at the

20  house, but specifically the Taurus Judge that was purchased in

21  December of 2017.

22  Q    And that's one that's part of the indictment?

23  A    Correct.

24  Q    And did law enforcement take guns away on that night?

25  A    They took that gun, yes.

*DIRECT EXAMINATION OF CHAD OUBRE*

1    Q    What happened to the other guns?

2    A    They were left.

3    Q    All right.  And the last photo, does that have any

4    significance to you?

5    A    That's the Apple watch that Mr. Kaspereit has a pattern

6    of stealing from Stephanie.

7    Q    And where was it found?

8    A    In his pocket.

9    Q    And does that connect to October 2018 and the theft from

10   Stephanie's house?

11   A    Those are -- yes.  So this watch as well as one of the

12   guns left at the scene that belonged to Stephanie were the two

13   items that were stolen from Stephanie's house.

14   Q    And Mr. Kaspereit was charged by the state for this

15   incident?

16   A    Yes.  March 16th.

17   Q    And is he awaiting trial?

18   A    He is.

19   Q    All right.  And he's released on bond pending that trial?

20   A    Correct.

21   Q    And there's a new VPO in place?

22   A    Correct.

23            THE COURT:  I'm sorry.  There's a new what?

24            MS. ANDERSON:  There's a new VPO, victim protection

25   order.

*DIRECT EXAMINATION OF CHAD OUBRE*

1             THE COURT:  So there is an effective VPO at this

2  time as to Stephanie only?

3             MS. ANDERSON:  It starts as of this incident.

4             THE COURT:  There is an effective VPO at this time

5  as to Stephanie?

6             MS. ANDERSON:  After this incident she gets a VPO in

7  the days --

8             THE COURT:  Let me try it again.

9        Is there now a present, enforced -- enforceable, I should

10  say, VPO that relates to the defendant and Stephanie?

11             MS. ANDERSON:  Today, yes.

12             THE COURT:  That's all I wanted to know.

13             MS. ANDERSON:  Yes.

14  Q    (By Ms. Anderson) And so let's turn to Exhibit 24.  This

15  is a DHS report?

16  A    Correct.

17  Q    Much longer report, but these are excerpts of it?

18  A    Correct.

19  Q    And was the 11-year-old son of Brittany and Chad

20  Kaspereit interviewed in April of 2018?

21  A    He was.

22  Q    And for context, there is the VPO -- the newest VPO is in

23  place?

24  A    Correct.

25  Q    And had Stephanie filed for a divorce?

*DIRECT EXAMINATION OF CHAD OUBRE*

1  A    Yes.

2  Q    All right.  And what did Brittany's oldest son say about

3  Mr. Kaspereit?

4  A    The son described a situation in which Chad Kaspereit

5  took him out shooting and they were shooting at windows.  Chad

6  said they were shooting at windows to test to see how the guns

7  would break them because he was curious about shooting his

8  ex's windows, referring to Stephanie.

9  Q    And from these DHS reports, where was Mr. Kaspereit

10 living at the time?

11 A    He was staying with Brittany.

12 Q    And if we turn --

13        THE COURT:  Wait -- wait -- wait a minute.  Let me

14 make sure I understand.

15        From what -- from the incident with Stephanie, now he is

16 back with Brittany?  Is that what you are relating to me?

17        THE WITNESS:  Yes, your Honor.

18        THE COURT:  Okay.

19        Go ahead.

20 Q    (By Ms. Anderson) Was there a period of about two weeks

21 reported in the DHS reports where he had been residing with

22 Brittany and the three children?

23 A    Correct.

24 Q    And based on the context and this interview timing, in

25 that time, is that when he took his son out to practice

*DIRECT EXAMINATION OF CHAD OUBRE*

1   shooting out Stephanie's windows?

2   A    Correct.

3   Q    Okay.  And was Stephanie interviewed in connection with

4   Brittany's children's DHS case?

5   A    I believe she was, yes.

6   Q    And is that in the next page of this?

7   A    Yes.

8   Q    And did she describe consistent events that we've seen in

9   other reports?

10  A    Yes.  She just describes -- additional ways of describing

11  similar and the previous events we've already talked about.

12  Q    When reviewing DHS reports, has Mr. Kaspereit ever

13  completed DHS requirements for classes or training or

14  treatments?

15  A    No.

16  Q    And have the DHS workers described Mr. Kaspereit as

17  cooperative?

18  A    Uncooperative.

19  Q    All right.  Have they described him as invested in his

20  children?

21  A    No.

22  Q    From your review of reports and evidence, has

23  Mr. Kaspereit ever demonstrated a willingness or ability to

24  comply with court orders and restrictions on his behavior?

25  A    No.

*DIRECT EXAMINATION OF CHAD OUBRE*

1  Q    And in addition to the documents in this binder, have you

2  also reviewed text messages from Mr. Kaspereit to Stephanie?

3  A    I have.

4  Q    And were those since this March 2018 incident?

5  A    Yes.

6  Q    And, in general, what do those appear to be?

7  A    He is in constant contact.  He goes from trying to get

8  her back into a relationship to cussing at her and making

9  threats via the text messages, goes back and forth, back and

10  forth pretty constantly.

11  Q    Is she responsive?

12  A    She responds with things like okay, or please, please,

13  stop texting me, stop contacting me, things like that.

14          THE COURT:  You say "constantly."  Tell me -- tell

15  me, how recently is that?

16          THE WITNESS:  These are text messages that

17  Mr. Kaspereit has sent to Stephanie since the VPO against him

18  where he's trying to get her and say things like, I can get

19  these dropped, we can get back together, and then he makes

20  threats against her and things like that.

21          THE COURT:  Since the charges were brought in March

22  of 2018, has he had these communications that you are relaying

23  to me?

24          THE WITNESS:  Yes, your Honor.

25  Q    (By Ms. Anderson) And that's your understanding based on

*DIRECT EXAMINATION OF CHAD OUBRE*

1   text messages received from law enforcement --

2   A    Correct.

3   Q    -- correct?  All right.

4        Is it difficult to tell the date on those text messages?

5   A    It is.  It's the context that indicates that it's since

6   then.

7   Q    And --

8        THE COURT:  Was there any condition on the state

9   bond that he have no contact with these people, to your

10  knowledge?

11       THE WITNESS:  The only knowledge I have is --

12  culminating from that March 16th incident is the VPO that was

13  filed and related to that March 16th incident.

14       THE COURT:  So he made a bond in state court of

15  $35,000 and that was the only condition, make a monetary bond?

16       THE WITNESS:  I am unaware of the exact conditions

17  aside from the VPO.

18       THE COURT:  Okay.

19       Go ahead.

20  Q    (By Ms. Anderson) In reviewing all of these reports and

21  DHS reports, have you come across information about

22  Mr. Kaspereit's father?

23  A    I have.

24  Q    All right.  Has he been involved in any of this?

25  A    He has in a way been involved in several of the VPO

*DIRECT EXAMINATION OF CHAD OUBRE*

```
 1   violations.
 2   Q    All right.  Where have the guns been stored?
 3   A    At his house.
 4   Q    All right.  And where has Mr. Kaspereit lived?
 5   A    At his house.
 6   Q    And in the violations, how does Mr. Kaspereit -- or
 7   Dewayne Kaspereit, Mr. Kaspereit's father, how does his name
 8   come in?
 9   A    Several threats came from Dewayne Kaspereit's phone to
10   the victims in this case making harassments and threats as
11   well as vehicles --
12            MR. HAMMOND:  I'm going to interpose an objection at
13   this time.
14            THE WITNESS:  -- belong --
15            THE COURT:  Just a moment.  Just a moment.
16            MR. HAMMOND:  The question is whether or not
17   Mr. Kaspereit is a danger.  It's not about his father,
18   Mr. Kaspereit, unless they can try it directly into his
19   behavior.
20            THE COURT:  You will be given the opportunity to
21   cross-examine and argue.
22       Complete your answer.
23            THE WITNESS:  As well as vehicles belonging to
24   Dewayne Kaspereit were seen to be following victims of the
25   VPOs and constitute the violations of the VPO.
```

*DIRECT EXAMINATION OF CHAD OUBRE*

1          THE COURT:  Okay.  Slow down.  I want to hear more

2   about the father and what he has done from your investigation.

3   You understand why.

4       What's relevant to me is one of the considerations is, if

5   he is released, he will have a condition to live at a specific

6   place as approved by the U.S. Probation Office or pretrial

7   services and this Court.  One of those places being considered

8   would be his parents' home.

9       Tell me what -- again, without interruption -- the father

10  has done actively, that you know of, that involved these

11  protective orders or these state charges or the federal

12  charge.

13          THE WITNESS:  I don't know of anything actively,

14  your Honor.  He just has allowed his son to utilize things

15  that belonged to him, either his home to store firearms or --

16          THE COURT:  Had anyone prohibited him from doing

17  that?

18          THE WITNESS:  From storing the firearms?

19          THE COURT:  Right.

20          THE WITNESS:  No, your Honor.  It's just a violation

21  of federal law for him to have the guns.

22          THE COURT:  I understand.  I understand all your

23  points about this person.

24       But his father, was he in any way restricted as to what

25  he could or could not do in relation to firearms --

*DIRECT EXAMINATION OF CHAD OUBRE*

1        THE WITNESS:  I don't have --

2        THE COURT:  -- where his son lived, anything?

3        THE WITNESS:  I don't have any information of that,

4  no, your Honor.

5        THE COURT:  Okay.

6     Go ahead.

7  Q    (By Ms. Anderson) Was there --

8        THE COURT:  Well, no.  Wait.  I've got to ask one

9  more thing.  You have inferred that he has somehow facilitated

10  threats and somehow I got interrupted or whatever.

11     Tell me where he, the father, has involved himself, other

12  than giving resources and facilities to the son who may have

13  made them -- where the father has made a threat to either

14  Stephanie or Brittany or any other victim.

15        THE WITNESS:  There was an incident in -- I believe

16  it was 2013, where Brittany filed a VPO against Dewayne

17  Kaspereit, which was ultimately dismissed.  I don't know the

18  nature of that.  I just know that it occurred.

19        THE COURT:  Okay.

20  Q    (By Ms. Anderson) Have you seen a docket for a VPO filed

21  against Mr. Kaspereit, Mr. Dewayne Kaspereit, the father, by

22  his wife?

23  A    I have.

24  Q    And were there domestic violence misdemeanor charges

25  filed against Dewayne Kaspereit related to that incident --

*DIRECT EXAMINATION OF CHAD OUBRE*

1    A     There was.

2    Q     -- with his wife?

3          And is there -- has there ever been another VPO against

4    Mr. Kaspereit by some other third party?

5    A     There was.

6    Q     Those ultimately --

7          THE COURT:  You mean Dewayne?

8          MS. ANDERSON:  Dewayne --

9          THE COURT:  Go ahead.

10         MS. ANDERSON:  -- correct.

11   Q     (By Ms. Anderson) And from your training and experience,

12   do those committing domestic violence typically deescalate or

13   escalate the severity of their attacks?

14   A     Escalate.

15   Q     And are you familiar with the cycle of violence?

16   A     Yes.

17   Q     Is one of the phases tension building?

18   A     Correct.

19   Q     And it leads up to an escalated event, a climax?

20   A     Correct.

21   Q     In your opinion -- well, first, has Mr. Kaspereit, to

22   your knowledge, ever been subject to serious federal charges?

23   A     No.

24   Q     Does he have any convictions that have not been dismissed

25   or expunged?

*EXAMINATION OF CHAD OUBRE*

1    A    Correct.  No, he does not.

2    Q    Or charges dismissed or expunged, to your knowledge?

3    A    Correct.  He does not.

4    Q    And in your training and experience, do -- does tension

5    and stress increase during prosecution?

6    A    It does.

7    Q    And could that make a domestic abuser more dangerous?

8    A    Sounds -- yes.  Sounds reasonable.

9    Q    And, in your experience, are domestic abusers dangerous

10   to just their victims or to others?

11   A    Others, including themselves.

12            MS. ANDERSON:  Pass the witness, your Honor.

13            MR. HAMMOND:  Thank you, your Honor.

14            THE COURT:  Does anybody need a break?

15       Are you all right?

16            THE WITNESS:  I'm all right.

17            THE COURT:  Go ahead.

18       You know what?  I've got a couple of questions I'm going

19   to ask, and maybe it will expedite this before your

20   cross-examination.

21            MR. HAMMOND:  Yes, sir.

22                        **EXAMINATION**

23   BY THE COURT

24   Q    So what I've got from a review is basically the last -- I

25   hate to use the term "overt incidents" but severe incidents

*EXAMINATION OF CHAD OUBRE*

1    regarding Brittany was in August of 2017.

2    A    Regarding Brittany, yes, sir.

3    Q    Brittany.

4         And regarding Stephanie was in March of 2018?

5    A    Correct.

6              MS. ANDERSON:  I --

7              THE COURT:  Excuse me?

8              MS. ANDERSON:  May I --

9              THE COURT:  You want to give testimony or do you

10   want to argue?

11             MS. ANDERSON:  No, your Honor.

12             THE COURT:  I will give you a chance to argue later

13   on.  Do you have any evidence you want to present?

14             MS. ANDERSON:  I could direct you to exhibits that

15   we --

16             THE COURT:  You can argue to those exhibits that you

17   referred to in your presentation.  I want to know what this

18   witness thinks.

19   Q    (By The Court) Who, if you know, is Tim Carson?

20   A    I believe that's Stephanie's ex-husband.

21   Q    Who is Richard Carson, if you know?

22   A    I believe that's his father.

23   Q    Do you have any evidence, as a result of your

24   investigation, that would indicate either one of these two

25   people have been threatened or any way could be considered in

*EXAMINATION OF CHAD OUBRE*

1    jeopardy if the defendant were released?

2    A    The defendant has made statements to Stephanie that he

3    wanted to kill her ex-husband, Tim.

4    Q    Tim?

5    A    And she said that was a bad idea because his dad is a

6    cop.  And he said, "I don't care, I will kill him too."

7    Q    Okay.  Have you done any investigation into the state

8    charges?

9    A    No, your Honor.

10   Q    Can you explain, if you know, why he bonded out almost a

11   year ago and nothing has happened?

12        Can you explain why he would make a bond in Cleveland

13   County in March of 2018 and it's never been set for another

14   thing?

15   A    I do not know, your Honor.

16   Q    It's a felony matter; correct?

17   A    Yes, your Honor.

18   Q    Which would -- well, never mind.  I'm not going to go

19   through that.

20             THE COURT:  Now, Mr. Hammond, you may proceed.

21             MR. HAMMOND:  May I approach the witness, your

22   Honor?

23             THE COURT:  I'm sorry?

24             MR. HAMMOND:  May I approach the witness?

25             THE COURT:  You may.

*CROSS—EXAMINATION OF CHAD OUBRE*

1    MR. HAMMOND:  And I only have about ten exhibits.  I

2  am going to be fast with them.  Some of them are duplicate.

3    THE COURT:  Have you presented these to counsel?

4    MR. HAMMOND:  She has a copy, your Honor.

5    THE COURT:  Very well.

6                    **CROSS—EXAMINATION**

7  BY MR. HAMMOND

8  Q    And I apologize if I pronounce your last name

9  incorrectly, but if you will start with Exhibit No. 1, does

10  that appear to you to be a docket sheet of the Stephens County

11  protective order?

12  A    Yes, sir.

13  Q    And based on your testimony and your experience as a law

14  enforcement officer, is it your opinion that Brittany

15  McCormick Kaspereit is afraid of Chad Kaspereit?

16  A    I believe that is true, yes, sir.

17  Q    Okay.  Would you look at the entry on the second page on

18  February 26, 2018.

19  A    Yes.

20  Q    And what does that say?

21  A    It's a jacket minute that says the plaintiff fails to

22  appear, which resulted in the protective order being

23  dismissed.

24  Q    Does that tell you that Brittany Kaspereit didn't show up

25  for that hearing?

*CROSS-EXAMINATION OF CHAD OUBRE*

1   A    Correct.

2   Q    And you've -- how many months have you investigated

3   Mr. Kaspereit?

4   A    This case began towards the end of 2018, I believe.

5   Q    Did you think it was an important question to ask

6   Brittany Kaspereit McCormick why she didn't show up for that

7   protective order hearing?

8   A    It's not part of my particular case, as far as the state

9   protective order and stuff like that.  So, no, I didn't ask

10  about that.

11  Q    Now, have you talked to Patrick Crowe, the assistant DA

12  in Cleveland County, about the pending felony charges in

13  Cleveland County?

14  A    I have not talked to him about those pending charges, no,

15  sir.

16  Q    Are you familiar with what Mr. Kaspereit is charged with

17  based on the March 2018 incident?

18  A    Only based on the reports from the incident.

19  Q    And what's your understanding of what he's charged with?

20  A    It's a felony domestic assault by -- I think it's felony

21  domestic assault, I believe, are the charges.

22  Q    Okay.  And based on your review of that case, did the

23  victim, Stephanie Kaspereit Carson, complain that

24  Mr. Kaspereit pointed a gun at her?

25  A    So there's many, many instances, which was difficult to

*CROSS-EXAMINATION OF CHAD OUBRE*

1  keep track of.

2  Q    I understand.

3  A    And that particular incident was actually a culmination

4  of several days' worth of incidents.  So I know that that

5  firearm was involved in several of their domestic violence

6  incidents.  Exactly as to the timeline, I would have to go and

7  review all of those reports.

8  Q    Do you agree that the pointing of the gun charge was

9  actually dismissed at the preliminary hearing?

10 A    I don't know.  I couldn't agree or disagree.

11 Q    Do you know that it was amended to a charge of

12 threatening with a gun just being in the room?  Do you know

13 that?

14 A    I don't know anything about the process of the state

15 court, what's been dismissed, not dismissed, charged.  I don't

16 know anything about that.

17 Q    Do you know of any violent acts or any threats that

18 Mr. Kaspereit has made to anyone since March of 2018?

19 A    I can't think of any off the top of my head without

20 reviewing all the different reports.

21         THE COURT:  I want to make sure you understood the

22 question.  He asked you:  Are you aware of any violent acts --

23      Go ahead.

24 Q    (By Mr. Hammond) Or threats that Mr. --

25         THE COURT:  -- or threats that he's made to anyone?

*CROSS—EXAMINATION OF CHAD OUBRE*

1    I assume you mean any people that we're concerned with

2    today and discussed about.

3        Are you aware of anything since March -- last March?

4            THE WITNESS:  I'm unaware of any that -- other than

5    the text messages, which, again, via context we believe were

6    recent but not -- unproven.

7            THE COURT:  You may inquire.  If you won't, I will.

8            MR. HAMMOND:  You can go ahead, your Honor.

9            THE COURT:  Well, you say nothing -- tell me again

10   about the text messages.

11           THE WITNESS:  So there is text messages that were

12   provided to one of the Oklahoma City detectives.  They're

13   screen shots of text messages, so the dates aren't there.  But

14   according to the context of what Chad is talking about, it

15   appears as if they are current and ongoing between Stephanie

16   and Chad.

17           THE COURT:  So Stephanie brought her phone, showed

18   the detective some text messages.  The dates aren't there, but

19   you construed them as threats?

20           THE WITNESS:  It appears to me that -- oh, there is

21   definitely threats.  It's just the date of the text messages

22   is -- is unable to be determined based on the screen shots.

23           THE COURT:  Do you know it was subsequent to the

24   filing of the charge?

25           THE WITNESS:  I do not know.

CROSS-EXAMINATION OF CHAD OUBRE

1          THE COURT:  So it could have been two or three years

2    ago?

3          THE WITNESS:  Yes, sir.  Yes, your Honor, it could

4    have been.

5          THE COURT:  And I'm not trying to confuse you.

6       Are you telling me that the content of the text is such

7    that you know it has to be a more recent incident?

8          THE WITNESS:  I do not know it has to be, no, your

9    Honor.

10          THE COURT:  Okay.

11       Go ahead.

12    Q    (By Mr. Hammond) Sir, I'm going to direct your attention

13    to Defendant's Exhibits 4 through 8.  Would you look at those,

14    please.

15    A    You said Exhibits 4 through 8?

16    Q    Yes, sir.

17    A    Okay.

18    Q    Do those appear to be pictures of Chad Kaspereit and

19    Stephanie Kaspereit?

20    A    Correct.

21    Q    And are those related to the March failure that was filed

22    in Cleveland County, Oklahoma?

23    A    I believe they are, yes.

24    Q    And if you will specifically look at No. 8, does that

25    appear to you to be a picture of someone that is terrified of

*CROSS-EXAMINATION OF CHAD OUBRE*

1    Mr. Kaspereit?

2    A    This is a still picture, so it would be hard to determine

3    that.

4    Q    Based on what you see, does she appear to be scared or

5    frightened of Mr. Kaspereit?

6    A    I can't talk about this photo as opposed to the video

7    that I've seen from this incident --

8    Q    Okay.

9    A    -- so --

10   Q    If you look at pictures 4, 5, 6 and 7, would you agree,

11   sir, that Mr. Kaspereit has more injuries than the victim,

12   Stephanie Carson?

13   A    She definitely has injuries, yes, sir.

14   Q    He does.

15   A    Yes, sir.

16   Q    Okay.  And, in fact, she ran over him with her car, did

17   she not?

18   A    That's the story that Mr. Kaspereit gave, yes, sir.

19   Q    Do you have any reason to dispute that?

20   A    The officers on scene did.

21   Q    Okay.  Now, the protective order that was issued based on

22   the Cleveland County case, he's actually facing a charge in

23   this federal case because of having a gun during that

24   protective order with the Cleveland County case.  Is that --

25   A    The protective order from 2015?

CROSS-EXAMINATION OF CHAD OUBRE

1   Q    No.  The one that was issued out of Cleveland County.

2   A    In 2018?

3   Q    Yes, sir.

4   A    No.  None of our federal charges are pertaining to

5   that --

6   Q    Okay.

7   A    -- March of '18 case.

8   Q    Now, based on --

9   A    Sorry.  I'm sorry.  Let me correct that.  There is the --

10  the possession of the firearm from October, in which he's

11  alleged to have stolen the firearm out of Stephanie's house

12  along with her Apple watch; so, yes, there would be.

13  Q    Okay.  What relevance does the Apple watch have to

14  whether or not Mr. Kaspereit is a threat to society if

15  released?

16  A    Only it lends to evidence that he did, in fact, steal

17  that firearm on that date.

18  Q    Did -- do you know if Stephanie Carson has gone over to

19  Mr. Kaspereit's home since that protective order was entered?

20  A    I haven't received that information.

21  Q    I'm going to direct your attention to Exhibits 9 and 10.

22  Could you look at those, please.

23  A    Yes, sir.

24  Q    Have you seen those exhibits before?

25  A    I believe -- yes, I believe I have.

1    Q    And do 9 and 10 indicate -- or are they -- they're

2    e-mails from Stephanie Kaspereit; is that correct?

3    A    Yes.  It's from Stephanie Carson Kaspereit to Jacobi

4    Whatley.

5    Q    Who works for the assistant DA?

6    A    Yes.  I believe so.

7    Q    She's basically changing her story, isn't she?

8    A    It does appear that way, yes, sir.

9    Q    She says in there that she had alcohol to drink and her

10   memory is not as good as what she thought.

11   A    Yes.  So let me clarify.  These -- this e-mail appears to

12   be similar to one of the photographs I've seen in the text

13   messages, but I have not seen this particular e-mail right

14   here.  I personally have not.

15           THE COURT:  And, again, the date is July 16, 2018?

16   Is that what --

17           THE WITNESS:  Yes.  That's what it indicates here,

18   sir.

19       And, sorry, what was your question that you just asked?

20           MR. HAMMOND:  I will just withdraw the question.

21   Q    (By Mr. Hammond) Were you aware that the Cleveland County

22   case was set for jury trial in October of 2018?

23   A    It was set?  No.  I'm -- like I said, I'm really very

24   unfamiliar with that state case.

25   Q    What's the reason for your investigation investigating

*CROSS-EXAMINATION OF CHAD OUBRE*

1  Mr. Kaspereit in this case?

2  A    The charges were sent -- or the information was sent to

3  our office.  It was assigned to me by my supervisor.

4  Q    Sent from who?

5  A    I'm not really sure, actually.  I was just --

6  Q    The Cleveland County DA?

7  A    I couldn't tell you.  The only time I have ever even seen

8  the DA from Cleveland County was after -- at the initial --

9  just a few days ago.

10 Q    Do you know why Mr. Kaspereit's children are in DHS

11 custody today?

12 A    I'm sure it's in those DHS reports, but I couldn't quote

13 exactly why, no, sir.

14          THE COURT:  I'd like to know why.  Make an offer of

15 proof.

16          MR. HAMMOND:  Can I tell you --

17          THE COURT:  Just make an offer of proof and I will

18 allow her to oppose it if she disagrees.

19          MR. HAMMOND:  The offer of proof -- of course, the

20 DHS worker is not here, your Honor, but I represent

21 Mr. Kaspereit in that case.

22          THE COURT:  I didn't ask you to give me your

23 background.  Make me an offer of proof, and I will allow

24 Ms. Anderson the opportunity to oppose it.

25          MR. HAMMOND:  Evidence --

*CROSS-EXAMINATION OF CHAD OUBRE*

1          THE COURT:  I just want to know why they are in

2    custody from your perspective.

3          MR. HAMMOND:  Evidence, your Honor, would be in

4    2018, April, that Brittany Kaspereit was drunk, driving around

5    with the kids, came over to Mr. Kaspereit's parents' house,

6    threatened them, threatened Mr. Kaspereit, left the residence.

7        Dewayne Kaspereit, the father, called DHS workers who

8    confronted Brittany McCormick.  She was intoxicated, arguing

9    with them.  And those kids --

10         THE COURT:  I said give me a brief presentation.

11   Bottom line is because Ms. Brittany -- it's because of

12   Brittany's conduct as a parent.

13         MR. HAMMOND:  Yes.  We called the police on her.

14         THE COURT:  And various instances where -- in its

15   discretion, the Department of Human Services decided to take

16   custody away from Brittany; correct?

17         MR. HAMMOND:  And been there ever since.

18         THE COURT:  Do you have anything to oppose that?

19         MS. ANDERSON:  Yes, your Honor.  I would say that,

20   in addition to Ms. McCormick's incident, that DHS workers also

21   relied on the fact that Mr. Kaspereit had been living in the

22   residence for two weeks after the VPO had been in place.

23         THE COURT:  Why am I not surprised?

24      Go ahead.

25         MS. ANDERSON:  And that he was under felony charges

*CROSS-EXAMINATION OF CHAD OUBRE*

1   by the state for domestic violence incidents involving

2   Stephanie that were very severe and troublesome to DHS.

3          THE COURT:  I hear ya.  I hear ya.  In other words,

4   it's two-sided.

5          MS. ANDERSON:  Yes, your Honor.

6          THE COURT:  Go ahead.  Proceed.

7          MR. HAMMOND:  And the children have been in --

8          THE COURT:  The children are in DHS custody.

9          MR. HAMMOND:  Ever since.  That would be our offer

10  of proof.  And I represent Mr. Kaspereit in that case.

11         THE COURT:  Fair enough.

12  Q    (By Mr. Hammond) Is it your testimony, Agent, that

13  Stephanie Carson today is afraid and concerned for her safety

14  in reference to Mr. Kaspereit if he was free on bond?

15  A    That's been expressed to me by her, yes.

16  Q    And are you aware that Mr. Kaspereit and Ms. Carson

17  actually lived together after charges were filed all the way

18  up until October of 2018?

19  A    All the way up until 2000 -- October of 2018?  No, I was

20  not aware of that.

21       But it's very common in domestic violence incidents for

22  that to occur and go backwards and forwards between times of

23  peace and times of extreme violence, which is illustrated by

24  the long history of Mr. Kaspereit.  So it's not surprising.

25  Q    And I understand that it's common for those people to get

1    back together.

2         But my question is:  During that time there is no

3    complaint of him threatening her or assaulting her, either by

4    Brittany and/or Stephanie Carson?

5    A    Meaning between March of '18 and October of '18?

6    Q    Yes, sir.

7    A    I don't have information of that.

8    Q    Mr. Kaspereit made a false report on an application,

9    allegedly.  And what month was that?

10   A    You mean -- the application, you mean, to purchase the

11   firearm?

12   Q    The reason we're here today.

13   A    Yes, sir.  That's --

14   Q    When was that done?

15   A    December 7th of 2017.

16   Q    So we had a VPO at that time out of Stephens County --

17   A    Correct.

18   Q    -- correct?

19        So we go three -- three more months down the road and

20   there is no VPO in place; correct?

21   A    Well, the VPO -- that VPO is dismissed in February of

22   2018, and then there is a new one in March of 2018.

23   Q    True.  So -- but there is a three-month gap in between

24   the application's made and the time it's dismissed?

25   A    Yes.

1  Q    Okay.  Now, did you ever go to Stephens County and talk

2  to the DA to see what happened on the felony that was filed

3  against Mr. Kaspereit in reference to what you testified to

4  earlier?

5  A    The only information I have about any of his state

6  charges is based on the reports that we talked about.

7  Q    Would it surprise you that the felony was dismissed?

8  A    Are you talking about the one that was expunged?

9  Q    Yes.  Yes.

10 A    I mean, I know that they're expunged just based on what

11 we have seen, yes.

12 Q    Did you check with the DA's office to see if

13 Mr. Kaspereit complied with his probation?

14 A    I would assume there was something favorable to

15 Mr. Kaspereit, which is why it was expunged.

16 Q    Did you ever interview anyone in the DA's office about

17 the reasons why charges were dismissed and/or deferred?

18 A    No, sir.

19         MR. HAMMOND:  I think that's all the questions I

20 have.

21         THE COURT:  You may redirect.

22         MS. ANDERSON:  Thank you, your Honor.

23         THE COURT:  I caution you.  I mean redirect.

24         MS. ANDERSON:  Yes.

25         THE COURT:  Nothing new.

*REDIRECT EXAMINATION OF CHAD OUBRE*

1          MS. ANDERSON:  All right.

2          THE COURT:  In response to his questions.

3                    **REDIRECT EXAMINATION**

4    BY MS. ANDERSON

5    Q    One of those last questions, I think there was a little

6    confusion so let's correct that.

7          There was reference to three months between an

8    application being made and dismissed.  You referred to the

9    purchase of the firearms in December of 2017; correct?

10         And he was referring to the dismissal of the VPO.

11         When was that VPO initially put in place?

12   A    The VPO was initially put in place in 20- -- September of

13   2015.

14   Q    So the VPO was in place -- the first VPO was in place

15   from September 3, 2015, until February 26, 2018 --

16   A    Correct.

17   Q    -- correct?

18         So it was more than three months before it was dismissed?

19   A    Yes.  Yes.  The VPO was long-standing over a couple of

20   years.

21   Q    Okay.  And does it surprise you that either of these

22   victims changed their stories at some point?

23   A    Not at all.

24   Q    All right.  And the messages from Stephanie recanting in

25   July of 2018 -- have you spoken to her since then?

*REDIRECT EXAMINATION OF CHAD OUBRE*

1    A    Yes.  I've spoken to her since July of '18, yes.

2    Q    And has she come back around to the stories as documented

3    in all of these reports?

4    A    Correct.

5    Q    All right.  In your experience, why do victims recant?

6    A    Because they're horrified of their attackers.

7    Q    All right.  Are they sometimes also in love with them?

8    A    Yes.

9    Q    All right.  And from the March 2018 incident, we looked

10   at some photographs of it --

11   A    Correct.

12   Q    -- correct?

13        And there was a reference to her running him over with

14   her car?

15   A    Correct.

16   Q    And you said law enforcement didn't believe that?

17   A    Correct.

18   Q    Could you explain why?

19   A    When you watch the body cam footage, immediately when

20   they arrive on scene they start comparing the way the scene is

21   to the story, and you could just tell by their conversation

22   they don't believe it.

23   Q    And are you able to observe tire marks and other things

24   that help make a determination as to who is telling the truth?

25   A    Right.  There's tire marks that's inconsistent with the

*REDIREDT EXAMINATION OF CHAD OUBRE*

1    story and -- yes.

2    Q    All right.  There has also been some communication

3    about -- or some discussion about anything that happened after

4    March of 2018.

5    A    Correct.

6    Q    All right.  Was the theft of the firearm and the breaking

7    and entering and burglary into Stephanie's home after March

8    2018?

9    A    Yes.

10   Q    When was that?

11   A    That was October of 2018.

12   Q    Okay.  And some of the exhibits we didn't get to, but

13   we'll just go through briefly.

14          THE COURT:  I assume these were part of the

15   cross-examination by Mr. Hammond.

16          MS. ANDERSON:  The cross-examination asked whether

17   there was anything after March 2018.

18          THE COURT:  Okay.  Be brief.  Be very brief.

19          MS. ANDERSON:  Yeah.  We will be very brief.

20   Q    (By Ms. Anderson) Does Exhibit 25 describe something

21   Mr. Kaspereit did after March 20 -- after the VPO was in place

22   on March 18, 2018 -- March 19 of 2018?

23   A    This is a report that Stephanie Kaspereit made in

24   Stephens County that she had been receiving texts from her

25   father-in-law's phone harassing her about money and a car; and

*REDIRECT EXAMINATION OF CHAD OUBRE*

1    that her husband, Chad Kaspereit, and her were going through a

2    divorce, and she believes he is sending those text messages

3    via his father-in-law's phone.

4    Q    Okay.  And had Mr. Kaspereit also called and reported a

5    crime that day?

6    A    Yeah.  He reported that his vehicle was stolen and that

7    it was a disgruntled employee.  However, he knew that

8    Stephanie had the car.

9    Q    And that was the same Jeep we talked about?

10   A    Correct.

11   Q    All right.  And did Stephens County decide that his

12   report was a false report?

13   A    Yes.

14   Q    Okay.  And does Exhibit 22 -- let's see -- let's go 23 --

15   describe other incidents that occurred after March 16, 2018?

16   A    Yes.

17   Q    Are there stalking incidents where Mr. Kaspereit is

18   alleged to have followed Stephanie since that VPO was put into

19   place?

20   A    Yes.  As well as calling, making phone calls, and things

21   like that.

22   Q    Okay.  And Exhibit 24 we already talked about.

23        When Mr. Kaspereit took his son to shoot out windows, was

24   that also after the March 16, 2018, incident?

25   A    Yes.

*RECROSS-EXAMINATION OF CHAD OUBRE*

1    Q    All right.  Given those exhibits and your knowledge of

2    those incidents, is it fair to say there have been ongoing

3    incidents against Stephanie Kaspereit since the VPO was put

4    into place?

5    A    Correct.

6    Q    All right.

7         MS. ANDERSON:  Nothing further, your Honor.

8         THE COURT:  Anything further?

9         MR. HAMMOND:  Just a couple of questions, your

10   Honor.

11        THE COURT:  I'm going to count them.

12   Go ahead.

13                     **RECROSS-EXAMINATION**

14   BY MR. HAMMOND

15   Q    Isn't it true, Agent, that Stephanie Carson's -- she

16   changed the way she felt about Mr. Kaspereit in October of

17   2018; is that correct?

18   A    Meaning?

19   Q    She got her kids taken away by DHS of October of 2018

20   because he was living there with her --

21   A    He --

22   Q    -- is that correct?

23   A    They found him at the residence that day, yes.

24   Q    And he didn't break into that residence.

25   A    That's not Stephanie's story.  Stephanie told me that he

*EXAMINATION OF CHAD OUBRE*

1  did break into that residence.  He was supposed to remain on

2  the porch, take his items, and leave.

3  Q    Okay.  Prior to that day, had he been living there?

4  A    I didn't get that information.

5  Q    But she actually got upset because she lost her children

6  to DHS.

7  A    She didn't express that to me.

8         MR. HAMMOND:  That's all I have, your Honor.

9                         **EXAMINATION**

10 BY THE COURT

11 Q    Do you believe he's a risk of flight?

12 A    He works out of state, so this job that we've been

13 talking about, it's out of state, either in Texas and New

14 Mexico.  To me, that's a risk of flight.

15 Q    Okay.  Anything else?

16 A    To the risk of flight, your Honor?

17 Q    Uh-huh.

18 A    No, sir.

19 Q    Obviously, you believe he is a danger to himself or

20 members of the community; is that correct?

21 A    Yes, your Honor.

22 Q    Specifically, who do you believe is endangered by his

23 release?

24 A    Stephanie Carson, Brittany McCormick, and himself.

25 Q    Okay.  Has he, to your knowledge, ever been put on any

EXAMINATION OF CHAD OUBRE

```
1    restrictions regarding contact with any of those individuals?
2    A    Yes, your Honor.
3    Q    Has he violated that?
4    A    Yes, your Honor.
5    Q    Has he ever been subject to a monitoring system,
6    electronically, you know, followed and monitored?
7    A    Not that I am aware of.
8              THE COURT:  Any reason why this witness may not be
9    excused?
10             MS. ANDERSON:  No, your Honor.
11             THE COURT:  Thank you for -- thank you for your time
12   and testimony.  You may step down.
13        Call your next witness, Ms. Anderson.
14             MS. ANDERSON:  The government rests.
15             THE COURT:  Mr. Hammond, do you wish to present
16   evidence?
17             MR. HAMMOND:  Just argument, your Honor, when it
18   comes time.
19             THE COURT:  I just want you -- the contents of the
20   pretrial services report is evidence.
21        Do you wish to present any -- do you just wish to present
22   argument?
23             MR. HAMMOND:  Yes.
24             THE COURT:  Very well.
25        Anything else from the government evidentiary-wise?
```

```
 1              MS. ANDERSON:  No, your Honor.

 2              THE COURT:  You may argue.

 3         No, no.

 4         You have the burden.

 5         She goes first.

 6              MS. ANDERSON:  Your Honor --

 7              THE COURT:  Let me start this off.

 8              MS. ANDERSON:  Yes.

 9              THE COURT:  And I'm not trying to confuse you, but I

10    do want to get to the point of the matter.

11         Do you believe he's a risk of flight?

12              MS. ANDERSON:  I believe he is a risk of flight,

13    but, more importantly, a risk of nonappearance.  And the Tenth

14    Circuit has held that suicide poses a risk of nonappearance.

15         And we have a demonstrated history of Mr. Kaspereit

16    threatening to commit suicide and shooting guns off in the air

17    above his head and other places saying -- and the victims

18    historically saying he always threatens himself.

19         Sometimes he threatens to murder them, but he always

20    threatens to kill himself.  And that is a risk of

21    nonappearance that has been recognized by the Tenth Circuit on

22    which we have a burden of preponderance of the evidence.

23              THE COURT:  But it's not presumptive in and of

24    itself.  Is that fair to say?

25              MS. ANDERSON:  That's fair to say.
```

1          THE COURT:  It's a factor to consider.

2          MS. ANDERSON:  It's a factor to consider.  But I

3   believe we have met our burden in that he has extensive

4   context -- contacts out of state with his jobs in New Mexico

5   and Texas and that one of his victims is out of state at this

6   point.

7       And we know that there are problems with recidivism and

8   going back --

9          THE COURT:  I didn't even know that.  Did we just

10  tell him one of the victims is out of state?

11         MS. ANDERSON:  Yes, your Honor.

12         THE COURT:  Go ahead.

13         MS. ANDERSON:  We had testimony that Brittany now

14  resides out of state.

15         THE COURT:  Go ahead.

16         MS. ANDERSON:  All right.  So the government's

17  position is that there is no condition or combination of

18  conditions that will reasonably assure the appearance of the

19  defendant or, as will be most of our focus, the safety of

20  others, including himself.

21      The statute provides that we should look at the nature

22  and circumstances of the offense, is the first factor.  For

23  that we have the nature of the circumstances are firearms

24  offenses in the context of really gruesome domestic violence

25  with ripped-out hair, strangling, threats of shooting people,

1  in, you know, a daughter's room -- a seven-year-old daughter's

2  room, urinating all over the room, lighting things on fire,

3  both clothing and furniture, and really gruesome repeated

4  domestic violence, much of which was never reported out of

5  fear of the victims.

6      And that is the context for his possession of all of

7  these firearms.  And thread through all of those violent

8  incidents is him using a firearm during those instances

9  whether or not there is a current VPO.

10      THE COURT:  You understand my purpose today, my onus

11  is not to punish him for things that have happened in the

12  past?

13      MS. ANDERSON:  I understand, your Honor, but --

14      THE COURT:  Or not to -- not to somehow engage in a

15  concern of domestic abuse and how this Court can somehow

16  remedy that.

17      MS. ANDERSON:  I understand.

18      THE COURT:  My concern is:  Are there reasonable

19  conditions that would reasonably -- are there conditions that

20  would reasonably assure his appearance before the Court and

21  reasonably assure the safety of the community?  That's my

22  obligation today --

23      MS. ANDERSON:  Yes, your Honor.

24      THE COURT:  -- according to statute.

25      MS. ANDERSON:  Yes.

```
1            THE COURT:  And you say there's not?

2            MS. ANDERSON:  I say there's not.  The nature and

3   circumstances is the first factor.  We have firearms offenses

4   that are -- the context of them, the circumstances of those

5   firearms offenses are violence.

6        We have threats to multiple victims, and we have shooting

7   guns in anger with different women over a three-year period of

8   time.

9        The weight of the evidence of the actual charges here is

10  very strong --

11           THE COURT:  I could not agree more with you.

12           MS. ANDERSON:  -- and --

13           THE COURT:  But my purpose today is not to punish

14  him.  That comes later, if he's convicted.

15           MS. ANDERSON:  I understand that, your Honor.

16           THE COURT:  You understand that?

17           MS. ANDERSON:  But the next factors then ask you to

18  look at the history and circumstances, his past conduct --

19           THE COURT:  Has he ever run?  And I'm not trying to

20  argue with you.  I'm really not.  I understand your concern.

21  I understand he's never faced a criminal proceeding like this

22  one.  I appreciate that and understand it.

23           MS. ANDERSON:  Yes.

24           THE COURT:  He's also never spent as much time in

25  jail as he has been since we had our arraignment the other
```

1    day, from my understanding.

2        He also has never looked at 20 years in prison -- federal

3    prison without parole or probation -- well, you know what I'm

4    talking about.

5            MS. ANDERSON:  I do, your Honor.

6            THE COURT:  There is a very different circumstance

7    here.  He has never had resources like pretrial services,

8    under the state system, to put restrictions on what he can and

9    cannot do if he is released.

10           MS. ANDERSON:  I understand, your Honor.

11           THE COURT:  Okay.

12           MS. ANDERSON:  But that's -- those same

13   circumstances of never being in the situation before

14   exacerbates the danger to the community because it increases

15   the stress, it increases the likelihood of violence, and

16   escalation of prior events.

17       So weight of the evidence is strong, but I really want to

18   focus on history and characteristics.  And there are several

19   categories we're supposed to factor in and, I think, are

20   relevant to my argument here that he is a threat to the safety

21   of others, including himself.

22       First, his character, his physical and mental condition

23   is a factor to be considered.  And the government has put

24   forward evidence of repeated and consistent instances where he

25   was angry and violent and suicidal and erratic.

1        As for his employment and financial resources, we know

2   that he has been employed out of state, that he has contacts

3   out of state and has had financial resources that could help

4   him to avoid appearance here.

5        And we know that he has -- not to skip ahead, but we know

6   that he has a history of violating court orders.  These victim

7   protection orders are court orders, and we've presented

8   countless instances where he has flagrantly violated court

9   orders for noncontact, for nonpossession of guns.

10       The very nature of the charges here are that he did not

11  abide by court orders and didn't follow directions.

12       We have DHS saying that he has never complied with their

13  requirements of him for mental health, for substance abuse,

14  for anything.

15            THE COURT:  But you also have a vast -- police

16  officers are there at the scene with guns there, they know

17  there is -- there is a protective order, and they leave a gun

18  with him.  I mean, I can give you example after example to

19  contradict your point.

20       And you're -- Ms. Anderson, I praise you.  You are very

21  interesting, you are an excellent advocate, you stimulate me

22  in court, and I love to hear your arguments and your

23  positions.

24       But I want you to understand that for every example you

25  give me of an incident that gives a possibility that he could

 1   run, a possibility that he could hurt other people or himself,

 2   there are also examples on the other side that says this

 3   ameliorates it.

 4        And that's the only thing I'm worried about.  And we need

 5   to start talking about what the expert has told me too.

 6        MS. ANDERSON:  Yes.

 7        THE COURT:  And we need to talk about the

 8   conditions.  Do you -- tell me why you believe the suggested

 9   conditions from the report would contraindicate his release.

10        MS. ANDERSON:  We have -- if we go through the

11   factors that we're asked to consider, we have drug and alcohol

12   abuse, broken bottles, alcohol, illegal steroids, syringes.

13        And then the Court is asked to look at past conduct.  We

14   have repeated violations of court orders.  They are not the

15   exact same conditions that would be in place here, but we have

16   no history of him complying with court orders.

17        And I understand that law enforcement might not have

18   seized guns when they had an opportunity, but that is not a

19   defense to Mr. Kaspereit's knowing possession and violation of

20   court orders --

21        THE COURT:  Which you've charged him with,

22   essentially.  The most relevant one -- two most relevant --

23   three most relevant ones you have charged him with, and he is

24   looking at a lot of time in federal prison.

25        MS. ANDERSON:  Yes, your Honor.

1          THE COURT:  I understand that.

2          MS. ANDERSON:  And he has stated in reports that are

3    in front of you -- I believe it is Tab 21 -- to Stephanie that

4    he will kill her ex-husband, he will kill her ex-husband's

5    father, who is a police officer, he will kill her, he will

6    kill himself, and he doesn't care if he goes to jail for the

7    rest of his life because it would be worth it.

8          THE COURT:  Where did it say that?

9          MS. ANDERSON:  It is in Tab 21, page 5 of the report

10   with Stephanie's interview, the highlighted section at the

11   top.

12         So in terms of his past conduct, not only is there

13   violence but he has violated court orders repeatedly.  He has

14   used his status on probation to deter reporting of the October

15   2016 incident.

16         He has had records expunged and so there have not really

17   been consequences in the past despite repeated violations of

18   court orders, at least not for Mr. Kaspereit.

19         Another factor is whether he was on release pending trial

20   for any conduct, and he has been awaiting a state felony

21   trial.  I will proffer to you my understanding is that it has

22   been continued to February of 2019, and --

23         THE COURT:  I thought it was set in October.

24         MS. ANDERSON:  My understanding is --

25         THE COURT:  It doesn't matter.  Go on.  It doesn't

1    matter.

2          MS. ANDERSON:  -- it has been continued.

3       But from March of 2018, when the VPO was in place, he has

4    committed several different acts, including the October

5    possession of Stephanie's firearm, when he stole the Apple

6    watch and firearm from her home with the burglary while he was

7    on release pending that state trial.  So that's all history

8    and characteristics.

9       And then we can go to the nature and seriousness of the

10   danger to any person.  And, as you can see through all of

11   these reports, the seriousness of the danger is severe.

12      He has strangled a nine-year-old child and thrown him to

13   the ground by his neck.  He's --

14          THE COURT:  Okay.  He's gonna say this -- and I'm

15   not arguing against you.

16          MS. ANDERSON:  Yes.

17          THE COURT:  He's never been convicted of anything.

18          MS. ANDERSON:  Correct, your Honor.

19          THE COURT:  He has never spent one day in jail for

20   any of these incidents.  Now, it may be a very interesting

21   intellectual argument about what this is really about, but

22   that's his record.  That's his conduct.

23      You know and I know I see people in here every day with

24   five and ten felony convictions.  Some, you know, based on

25   pretty rough circumstances.  And these people get released.

1          MS. ANDERSON:  I understand, your Honor.  Our

2    argument is that he should not be released, and the Court can

3    consider conduct and reports and crimes even if they have not

4    resulted in a conviction.

5          And here law enforcement has provided testimony that,

6    from the body cam footage that he's watched and the interviews

7    that he's listened to -- the audio recordings and other

8    things -- that Stephanie's version is accurate and that law

9    enforcement at the scene were persuaded that her version was

10   accurate -- those events -- and there was a lot of physical

11   evidence both times that was consistent with Brittany and

12   Stephanie's recollection of the events.

13         There are also consistent threads through there to their

14   stories of multiple instances that are similar, which

15   corroborates each other.  Because we don't have just one

16   victim or one accuser.  And we also have third parties that

17   have filed court violations of the protective orders against

18   Mr. Kaspereit.

19         So this is not a "he said/she said" in that there is

20   physical evidence and other things to show that he is

21   responsible for these injuries and harm, including the

22   testimony --

23              THE COURT:  Understand.

24              MS. ANDERSON:  -- of the statements of the children

25   themselves.

```
1            THE COURT:  I understand.

2       Well, what it comes down to is what we always talk about,

3  and that is we're taught in law school that people are only

4  punished for what they do, not what they might do.  And when

5  they've never been to a detention hearing in a federal

6  court -- because, in fact, they can be incarcerated and their

7  freedom taken away because of what they might do.

8       Anything else?

9            MS. ANDERSON:  No, your Honor.

10      Our argument is that there is no condition or combination

11 of conditions that would reasonably assure his appearance.

12           THE COURT:  I understand.

13           MS. ANDERSON:  The risk of flight and nonappearance,

14 the main factor in that are his out-of-state contacts and his

15 suicide risk, which the Tenth Circuit has recognized as a

16 factor, and the safety of other people.

17      We have lots of potential victims -- the children, the

18 women, their relatives, and others -- and a pattern of serious

19 deadly domestic violence that's corroborated by hard evidence

20 and photographs and videos and countless documents, not just

21 those --

22           THE COURT:  I understand.  I understand.  Well put.

23           MS. ANDERSON:  Thank you.

24           THE COURT:  Mr. Hammond.

25           MR. HAMMOND:  Thank you, your Honor.
```

1    I will be brief, your Honor, because I agree with what

2    the probation office is recommending to the Court.

3         THE COURT:  I understand.  Pretrial services,

4    technically.

5         MR. HAMMOND:  Yes.  Pretrial services.

6    As far as Mr. Kaspereit's flight risk, I have represented

7    Mr. Kaspereit probably on eight or ten different cases.  And I

8    can tell the Court what's happened on all of them.

9    The Court has been entertaining -- between looking at 25

10   exhibits from the United States and the exhibits we presented,

11   I think the Court is aware --

12        THE COURT:  Yeah.  I mean, there is no doubt I am

13   very frustrated.  I mean, I would love to know what -- the

14   next page on this notebook and then I would know what to do

15   today.

16        MR. HAMMOND:  Yes.  And I can tell the Court, back

17   in October of 2018, we were ready to go -- he has actually

18   looked forward to going to trial in Cleveland County.  We

19   think we can beat that case.  And I know we could.

20        THE COURT:  Why doesn't he leave these people alone?

21        MR. HAMMOND:  That's a good question, your Honor.

22   And I think, as the Court can see from the notebook, there is

23   wrongdoing on both sides.  I am not blaming victims.  But if

24   he would stay home every night and not go out and drink, he

25   would be much, much better off.  And I have had a lot of talks

```
 1    with him about it.
 2              THE COURT:  You know, I have done this for almost 40
 3    years, and I have never seen a situation where, in a
 4    domestic-type environment -- which I am very accustom of from
 5    my state court days partially to here -- I mean, you know and
 6    I know what's going on here.  We've got to punish this guy for
 7    something, even though it's not what we really want to punish
 8    him for.  Right?
 9              MR. HAMMOND:  I understand, your Honor.
10              THE COURT:  Okay.
11              MR. HAMMOND:  And I know his family.  There will be
12    no problem with Mr. Kaspereit coming to court.  There has
13    never been any issue with him coming to court.  He might
14    have --
15              THE COURT:  Who is he going to live with?  Talk to
16    me about the residency, because I'm going to meet with some
17    people here in a minute, and that's the first question I'm
18    going to ask them.
19         My biggest concern -- and maybe a reason to detain him --
20    is where is he going to live and who is he going to be with on
21    these times when he is not with -- I assume permission to keep
22    his lucrative job going down to Texas to work for two weeks
23    out of the month.
24              MR. HAMMOND:  Right.
25              THE COURT:  What about mom and dad?
```

```
 1                MR. HAMMOND:  Two options.

 2                THE COURT:  Are they here?

 3                MR. HAMMOND:  His mother is here.

 4                THE COURT:  She is here?

 5                MR. HAMMOND:  I was even going to have her testify,

 6     but --

 7                THE COURT:  I couldn't tell these people, who they

 8     were for or against.  They were very good audience members.

 9     But that's --

10                MR. HAMMOND:  Mother and his sister.

11                THE COURT:  Okay.

12                MR. HAMMOND:  And they live in Duncan.

13     Mr. Kaspereit can stay in Duncan with them.

14                THE COURT:  Who else -- where does Stephanie -- no,

15     no, I have got to be careful.

16          Do any of the victims live in Duncan?

17                MR. HAMMOND:  No.  Brittany has moved to Waco,

18     Texas --

19                THE COURT:  And when I use the word "victim," I

20     don't want you to take that as a word adopted by the Court.

21     Referenced to who we've talked to today.

22                MR. HAMMOND:  Stephanie lives in Velma, which is

23     about 15 miles east, your Honor.

24                THE COURT:  Okay.

25                MR. HAMMOND:  He can stay there.  And I have no
```

1    problem with him being confined there.  The only problem is he

2    couldn't work for about ten months.  He is making $25,000 per

3    month now by working two weeks in Texas and then --

4              THE COURT:  Yeah.  What happens when he gets enough

5    money and decides he doesn't like this world.  He may just get

6    him a plane and head further south than he used to.

7              MR. HAMMOND:  Your Honor, he has lived all of his

8    life in Stephens County.  His family is there.  And we've

9    lived through a lot of hard times, and he has never not gone

10   to court.

11             THE COURT:  He has never been in this situation

12   ever.

13             MR. HAMMOND:  That's true.

14             THE COURT:  Ever.

15             MR. HAMMOND:  That's true.  He has never been in --

16             THE COURT:  Because you've got a prosecutor over

17   here that wants you to go to prison for a long time.  And not

18   the kind of prisons you think about.

19             THE DEFENDANT:  I understand.

20             MR. HAMMOND:  And, actually, I will tell the

21   Court -- and it may not be relevant to -- he didn't even know

22   what he got arrested for.  He calls me Monday morning and he

23   said, "What did I do?  What did I do?"

24        So he understands the seriousness of it, but these three

25   charges that he has been charged with, even though guns are

```
 1    violent, it's not where he went out and got a gun and shot
 2    somebody.  He was a person who shouldn't have possessed it.
 3            THE COURT:  I don't think you want to talk to me
 4    about the weight of the evidence.  That's pretty -- I mean,
 5    we're talking today about whether he ought to spend the night
 6    in jail or whether he ought to be on his way home.  That's
 7    what I'm concerned with.
 8        And if you want to talk about the weight of the evidence,
 9    we're going to change the whole posture of this deal.
10            MR. HAMMOND:  No.  I'm not --
11            THE COURT:  Because I've got -- you know, his life
12    is going to change in the next few months, in my opinion, but
13    that's me.
14            MR. HAMMOND:  No question.  But what I'm saying
15    here, he was pulled over and didn't run.  He called and he is
16    here to deal with it and he is not going to run off.
17            THE COURT:  Okay.
18            MR. HAMMOND:  And I think there's two options.  He
19    has got a fifth-wheel trailer when he goes to work, but the
20    problem is, with home detention, he cannot live two weeks in
21    Texas and two weeks in Oklahoma.  He has to live one place --
22            THE COURT:  Well, yeah, he can.  There is an
23    exception for employment.  Now, where he's actually at in
24    Texas is another matter.  But -- and here I'm arguing with
25    you.
```

1          And I argued with you.

2          I don't want to argue with you people.  I respect you as

3     officers of the Court.

4               MR. HAMMOND:  And I think that would be appropriate

5     for the Court to set an unsecured bond, put restrictions on

6     travel.  Maybe Mr. Kaspereit can stay in the Western District

7     except for --

8               THE COURT:  Is the mother willing to vouch for him?

9               MR. HAMMOND:  I'm sorry?

10              THE COURT:  Is the mother willing to vouch for him?

11              MR. HAMMOND:  Yes, your Honor.

12              THE COURT:  She wants him released?

13              MR. HAMMOND:  Yes.

14              THE COURT:  She wants him living in her house?

15              MR. HAMMOND:  That's correct.

16              THE COURT:  Will she take up the responsibility of

17    telling on him if he violates?

18              MR. HAMMOND:  She will.

19              THE COURT:  Do you understand if I make her a

20    custodian -- if -- and I'm not saying I am.  I am trying to

21    come through all the possibilities here.

22         If I make her a custodian of the defendant, it's going to

23    be one of the main reasons he is released.  But the main

24    reason he is going to be released is because she's going to

25    vouch and swear to the Court, if I allow it, to tell on him,

1   to rat on him if he violates.

2        And I can tell -- you know some of the conditions.

3            MR. HAMMOND:  She's willing to accept that.

4            THE COURT:  And if she sees him violate a condition

5   of release, she has got to call pretrial or we've got a real

6   problem.

7            MR. HAMMOND:  Yes.  And I think she --

8            THE COURT:  Does she want to take on that

9   responsibility of having a real problem?

10           MR. HAMMOND:  She does.

11           THE COURT:  Have you talked to her?

12           MR. HAMMOND:  Yes.  And she was interviewed by

13  pretrial services.  I didn't call her as a witness because her

14  information is actually in your report.

15           THE COURT:  I understand.  Okay.

16       Anything else you want to highlight?  We're going to get

17  to this.

18           MR. HAMMOND:  I think all the other conditions are

19  appropriate, your Honor.

20           THE COURT:  Your chance, Ms. Anderson, finally.  You

21  have the burden.

22           MS. ANDERSON:  I just want to point out to the Court

23  that most of the violations in Tab 15 of the VPOs that were

24  reported as violations of the VPOs, as well as the ones that

25  were reported --

```
 1              THE COURT:  All happened in Duncan.

 2              MS. ANDERSON:  -- all happened while he was residing

 3    with mom and dad in their home in Duncan.

 4              THE COURT:  I understand that.  I do.

 5              MS. ANDERSON:  His threats also are not -- location

 6    monitoring doesn't prevent him from harming these women.

 7    Being in Texas doesn't prevent him from harming these women.

 8    Brittany is living in Texas now.

 9         But his threats and other types of harm he inflicts on

10    them involve -- and I think the report -- it's 23 -- where he

11    has made fraudulent purchases using their accounts on Amazon,

12    as testified by Special Agent Oubre.

13         He has used -- stolen their social security --

14              THE COURT:  We have got a real easy solution then.

15    If he does one of those things one time, she tells you and you

16    file a motion, you come to my court, and he will be put

17    somewhere where he doesn't do that.

18              MS. ANDERSON:  And we have a history of him using

19    other people's electronic devices --

20              THE COURT:  I will use very expeditiously the phrase

21    "cause and effect" on my conditions of release if he's

22    released, I assure you.

23              MS. ANDERSON:  Your Honor, the government is of the

24    position here that he is far too dangerous --

25              THE COURT:  I know.  I understand.
```

```
 1          MS. ANDERSON:  -- the weight of the evidence is far
 2   too strong --
 3          THE COURT:  I understand.
 4          MS. ANDERSON:  -- and there is no condition or
 5   combination of conditions that will make sure he doesn't harm
 6   himself --
 7          THE COURT:  I appreciate --
 8          MS. ANDERSON:  -- or others.
 9          THE COURT:  I appreciate your passion and your
10   zealousness.
11          MS. ANDERSON:  Thank you.
12       (A short recess was taken.)
13          THE COURT:  The Court has considered all evidence
14   and argument presented to the Court at this proceeding and is
15   prepared at this time to enter its decision regarding the
16   detention consideration before the Court.
17       It's the finding of the Court at this time that there are
18   conditions -- or I should say a combination of conditions in
19   the Court's mind that would reasonably assure the defendant's
20   appearance in court and the safety of the community.
21   Therefore, the government's motion for detention will be
22   denied.
23       And I am prepared at this time to advise the defendant of
24   the conditions of release that will be -- that he will be
25   subject to under release.
```

1       With that said, Mr. Hammond, if you and your client would

2   approach the podium, please.

3       You are going to be released -- first of all, I am going

4   to inquire of Twyla.

5       You are the defendant's mother; is that correct?

6           MRS. KASPEREIT:  Yes, sir.

7           THE COURT:  The lawyer -- his lawyer made certain

8   representations to me that you would be his custodian if

9   ordered to do so -- third-party custodian is what we call

10  it -- if ordered to do so by the Court.

11      Now, you give me the answers you want to give me, not

12  what you think somebody else wants you to say or whatever.

13      Are you willing, basically, to allow him to stay at your

14  house, to follow your household rules; basically, however, to

15  not only see to it that he comes to court at all times, which

16  will be a requirement, but, more importantly than anything,

17  that if he violates any condition of his release, you will

18  immediately call pretrial services?

19          MRS. KASPEREIT:  Yes, your Honor.

20          THE COURT:  You have no problem with any of that?

21          MRS. KASPEREIT:  Absolutely not.

22          THE COURT:  Okay.  And he lives -- well, we have the

23  address on Elk Avenue.  Is that correct?

24          MRS. KASPEREIT:  Yes.

25          THE COURT:  Very well.

```
1            MRS. KASPEREIT:  Yes, sir.
2            THE COURT:  Have a seat.  Thank you.  Do not leave
3    today until the clerk tells you you can leave and the pretrial
4    service officer tells you you can leave.  Make sure we have
5    all the information necessary.
6            MRS. KASPEREIT:  Yes, your Honor.
7            THE COURT:  Sir, what I am basically saying is I am
8    putting your mother in this with you because you are going to
9    live with her and your father at that residence in Duncan.
10   And they are to report -- or she is to report to pretrial
11   services any violation, no matter how minor, of any of these
12   conditions I am getting ready to give you.
13       Do you understand that?
14           THE DEFENDANT:  Yes, sir.
15           THE COURT:  So if you want her to have a problem
16   with the Court, just violate one, talk her into not reporting
17   it, and then you can get your mom involved in all of this.
18       Do you understand all of that?
19           THE DEFENDANT:  Yes, sir.
20           THE COURT:  Okay.  Now, I will tell you another
21   thing before I go over these.  This is a very close case.  A
22   very close case.  And I will tell you, you will not be given
23   the benefit of any other doubt than you have been given today.
24   No matter how minor the violation is, your last few nights
25   will be your future.
```

1          Do you understand that?

2                THE DEFENDANT:  Yes, sir.

3                THE COURT:  I will put you back in jail and not even

4      think twice about it.  I don't want to hear any suggestion

5      that you violated any of these rules from anybody.  Is that

6      clear?

7                THE DEFENDANT:  Yes, sir.

8                THE COURT:  And you've got, apparently, some people

9      in the prosecution that's going to watch you pretty close, so

10     I would suggest you dot your Is and cross your Ts.

11         You understand you've got a big old microscope looking

12     right at you?

13               THE DEFENDANT:  Yes, sir.

14               THE COURT:  Okay.  First of all, of course, you are

15     to sign a bond where you promise you will appear in court at

16     all times.  Now, I will tell you failure to appear can result

17     in separate criminal matters, but appear in court at all

18     times.

19         You are, of course, not to violate any city, state, or

20     federal law while you are out on this bond, no matter how

21     minor the infraction.  That's a violation.

22         Is that clear to you?

23               THE DEFENDANT:  Yes, sir.

24               THE COURT:  You are to keep your address current

25     with pretrial services at all times.  Of course, the bottom

1   line is you are not supposed to -- it doesn't even relate to

2   you because you are not supposed to move unless the pretrial

3   services gives you the approval to move some other place other

4   than your parents' house.

5       Do you understand that?

6           THE DEFENDANT:  Yes, sir.

7           THE COURT:  You are to participate, if required to

8   do so, in all DNA collection that is required by pretrial

9   services.

10      Do you understand that?

11          THE DEFENDANT:  Yes, sir.

12          THE COURT:  You will execute a $10,000 unsecured

13  bond, which basically means that you don't have to put up

14  anything right now.  But if you violate any city, state -- any

15  of these conditions, any of them -- fail to appear, violate a

16  condition of release -- you automatically owe the government

17  $10,000.

18      Do you understand that?

19          THE DEFENDANT:  Yes, sir.

20          THE COURT:  Your mother will be custodian.  She will

21  monitor you.  She is releas- -- you are released to her house.

22  If she decides you can't live at her house, you are going to

23  live in jail.

24      Do you understand that?

25      Unless you hope pretrial can find another suitable home.

```
 1   And that's very questionable under the circumstances.
 2         You will report by noon on -- I guess it would be
 3   Tuesday, wouldn't it -- Monday is a holiday -- but you will
 4   report by noon --
 5         -- and, ma'am, I want you to listen to these too to make
 6   sure you understand --
 7         -- noon on Tuesday -- that's our next working day -- to
 8   Ms. Candace Shane at a number that will be provided to you.
 9   It is your requirement to contact her.  It is not her
10   requirement to contact you.
11         Do you understand that?
12             THE DEFENDANT:  Yes, sir.
13             THE COURT:  Now, you will continue or actively seek
14   employment, and you're going to see how your life is getting
15   ready to change.  I'm going to tell you right now if this is
16   about saving your job in Texas, it's not going to happen.
17         You're not going to be going to Texas.  So get that out
18   of your mind.  I don't know how you can make a living, or
19   where, but you will not be going to Texas for two weeks on
20   your own.
21         Do you understand that?
22         And I don't have to explain to you why, because it's my
23   discretion to let you go.  There is a good reason why -- as a
24   matter of practical application of your other conditions, why
25   you cannot go to Texas.
```

1          You understand that?

2          Because you -- well, I'll tell you right now.  I'll just

3     be blunt with you.  You are going to be monitored.  You've got

4     an ankle bracelet.  And we know we can get you if you're in

5     Duncan.  We don't know if we can get you in Texas.

6          Do you understand that?

7               THE DEFENDANT:  Yes.

8               THE COURT:  So if you want your freedom, it means

9     you are going to stay -- you're going to be employed and

10    travel in and stay within the Western District of the State of

11    Oklahoma.  I will get to that one later.

12         Is that clear?

13              THE DEFENDANT:  Yes.

14              THE COURT:  You are to surrender your U.S. passport

15    by noon on Tuesday to the U.S. Probation Office.  You are not

16    to apply for any other travel document -- a visa or any other

17    passport, anything like that.

18         You'll abide by the following restrictions on personal

19    associations, residence, or travel.  Again, your travel and

20    employment is restricted to the Western District of Oklahoma

21    unless it is preapproved in advance by the U.S. Probation

22    Office.

23         Do you understand that?

24              THE DEFENDANT:  Yes.

25              THE COURT:  You can have other options.  These

1   people control your life right now is the way to look at it.

2   And you don't want them coming to me saying there is a

3   problem.

4        You understand?

5             THE DEFENDANT:  Yes, sir.

6             THE COURT:  So if -- they approve your job, they

7   approve where you travel.  If it's outside the Western

8   District of Oklahoma, you can go to them and ask things and

9   they may say no, they may say yes, but they approve in advance

10  anything beyond that.

11       Is that clear?

12       You can work in the Western District of Oklahoma.  You

13  reside there at your parents' house.  You've got to be

14  employed there.  Beyond that, you better talk to them.

15       Do you understand?

16            THE DEFENDANT:  So that means if I go where --

17            THE COURT:  Talk to me.

18            THE DEFENDANT:  If I go to work, ask them?  If I

19  have to go to Texas for a week, ask them?

20            THE COURT:  Yeah.  But they're going to tell you no,

21  because I've told them to tell you no.  They don't want you in

22  Texas.  You're not leaving the Western District of Oklahoma

23  because you're going to have something on your ankle.

24       And I mean to tell you, you don't want any -- you may

25  have heard about it and read programs about it or seen

1    programs on TV.  You don't want to mess with this -- I am not

2    going to listen to this excuse about, gee, it got wet or --

3    you know, I don't know what happens.

4         But you better not mess with your ankle bracelet because

5    they are going to monitor it.  And I am not going to go into

6    the reasons why, but the best opportunity for us always to

7    know where you are physically at all times is for that

8    monitoring device to be effective.  And it will be effective

9    in the Western District of Oklahoma.

10        Does that -- do you understand that?  I don't care if you

11   agree.  Do you understand?

12             THE DEFENDANT:  Yes.

13             THE COURT:  You are to avoid all cont- -- did we

14   cover all that, Ms. Fye?

15             PROBATION OFFICER:  Yes.  Yes, sir.

16             THE COURT:  Okay.

17        You are to avoid all contact, directly or indirectly --

18   listen to that -- directly or indirectly.  You are not to

19   contact them, you are not to cause anybody else to contact

20   them.

21        They have got a lot of power over you right now, the

22   people I am getting ready to name, because if they bring an

23   accusation to pretrial services that you've tried to contact

24   them, text them, tell a friend down the street to call them

25   for you, I don't care what, that's going to give you a real

```
 1    problem.  You are going to see me again for a few minutes and
 2    then I won't see you for a long time.
 3         Do you understand?
 4              THE DEFENDANT:  Yes.
 5              THE COURT:  Okay.  You are to avoid contact,
 6    directly or indirectly, with any person who is or may be a
 7    victim or witness in this matter, including specifically --
 8    and tell me as I name their names, do you understand the
 9    people:  Brittany Nicole McCormick.
10              THE DEFENDANT:  Yes.
11              THE COURT:  You know who that is?
12              THE DEFENDANT:  Yes.
13              THE COURT:  Stephanie Carson, do you know who that
14    is?
15              THE DEFENDANT:  Yes.
16              THE COURT:  Tim Carson, do you know who that is?
17              THE DEFENDANT:  Yes.
18              THE COURT:  Richard Carson, do you know who that is?
19              THE DEFENDANT:  Yes.
20              THE COURT:  They're not part of your life right now.
21    You make them part of your life, you know what's going to
22    happen.  Okay?
23              THE DEFENDANT:  Yes, sir.
24              THE COURT:  And I don't want to hear a reason or how
25    that's not fair or you've got to do this to do that.  You're
```

```
 1   not to see them, contact them one way or another.
 2        Is that clear?
 3             THE DEFENDANT:  Yes.
 4             THE COURT:  Okay.  You are to get such medical and
 5   psychiatric treatment as is directed to do so by the U.S.
 6   Probation Office.
 7        Do you understand that?
 8             THE DEFENDANT:  Yes.
 9             THE COURT:  You are not to possess a firearm,
10   destructive device, or other weapon.
11        Your parents apparently -- I want the firearms taken out
12   of the house.  That's a condition.
13             MRS. KASPEREIT:  Yes, sir, your Honor.
14             THE COURT:  All right.  Thank you.
15        Now, I've changed the one -- you are not to use any
16   alcohol.  One sip of beer and you've violated.  Is that clear?
17   That way it's real easy to monitor.  I don't like the word
18   "excessive."  I don't know what that means to people.
19        So we are going to say not use any alcohol.
20        Clear enough?
21        Mom, you see him take one chug of beer, what are you
22   going to do?
23             MRS. KASPEREIT:  I'm going to call.
24             THE COURT:  You got it.  Have a seat.  Thank you.
25        You are not to use or unlawfully possess a narcotic drug
```

1  or other controlled substance unless it is prescribed by a

2  licensed medical practitioner.

3       Do you understand that?

4            THE DEFENDANT:  Yes.

5            THE COURT:  You are to submit to testing of any

6  substance if required to do so by pretrial services.

7       Now, they have various kinds of tests.  I will tell you

8  failure to take the test or in any way try to affect the test,

9  tamper with it, whether you've used or not, is the same as if

10 you've used.  That's a failure.

11      Do you understand?

12           THE DEFENDANT:  Yes.

13           THE COURT:  You are to participate in the following

14 location restriction program and comply with these

15 requirements:  You are in home detention.  Remember that term.

16 You are in home detention.  Think of yourself as being in jail

17 in your parents' house.

18      Do you understand that?

19           THE DEFENDANT:  Yes.

20           THE COURT:  You are restricted to that residence at

21 all times except for employment that is approved, education,

22 which doesn't relate to you, religious services, medical,

23 substance abuse, or mental health treatment, attorney visits,

24 court appearances, court-ordered obligations, or other

25 activities approved in advance by the U.S. Probation Office.

1        Do you understand that?

2                THE DEFENDANT:  Yes.

3                THE COURT:  You don't run down the street on Sunday

4    morning to get a pack of cigarettes.  It's a violation.

5    Simple as that.  You don't run to the store for mom.  It's a

6    violation.  Simple as that.  You are in that house unless you

7    are doing one of these things.

8        Is that clear?

9                THE DEFENDANT:  Yes.

10               THE COURT:  And they will know where you are at all

11   times.

12       Do you understand that?

13               THE DEFENDANT:  Yes.

14               THE COURT:  Can you draw my attention?  Sure.

15               MRS. KASPEREIT:  His children, he has -- he sees his

16   children every day.  He provides for his children.  He was

17   fixing to get his children because DHS foster care right here,

18   his sister, has care and he helps with care.

19               THE COURT:  What are you asking me?

20               MRS. KASPEREIT:  Visitation, does he still --

21               THE COURT:  They can come to your house.  I didn't

22   say they couldn't come to your house.

23               MRS. KASPEREIT:  He can't go to their house?

24               THE COURT:  No.  Not unless it's approved by the

25   U.S. Probation Office.

1          MRS. KASPEREIT:  Can I not -- he not go in my

2   presence?

3          THE COURT:  Listen to me again.  No, unless it is

4   approved by pretrial services.

5          MRS. KASPEREIT:  Okay.  Okay.

6          THE COURT:  Or I can put him back in jail if you

7   would rather me do that.  Keep it simple.

8          MRS. KASPEREIT:  Oh, absolutely not, but...

9          MR. HAMMOND:  I can explain what she needs to do,

10  your Honor.

11         THE COURT:  Sure.  It's real simple.

12         MR. HAMMOND:  I will visit with you.

13         MRS. KASPEREIT:  Okay.

14         THE COURT:  You know what?  Don't stretch the rubber

15  band.  It's about ready to pop.  Okay?

16      Okay.  You are to submit to location monitoring as

17  directed by pretrial services, and basically you must pay for

18  that program to the extent you're able to pay.

19      But, basically, you're going to get an ankle bracelet.

20  And they'll put it on you and tell you what to do, not do.  I

21  don't want to hear anything about, Gee, I didn't understand, I

22  don't know why it went off, all this stuff I hear all the

23  time.  It's not going to happen.

24      You pay attention to what you can and can't do, how you

25  use it, how you operate it.  They will make it very clear.

 1    And don't inhibit in any way its ability to find out where you

 2    are at all times.

 3         Is that clear?

 4              THE DEFENDANT:  Yes, sir.

 5              THE COURT:  Okay.  You are to report as soon as

 6    possible any contact you have of any nature whatsoever with

 7    any law enforcement authority.

 8         If you're driving out to church with your parents and

 9    they get stopped for speeding, that's a contact.  Tell

10    pretrial services.

11         Do you understand that?

12              THE DEFENDANT:  Yes.

13              THE COURT:  You are to contribute to the cost of

14    your treatment services rendered based upon your ability to

15    pay.  Monitoring, all these things, medical services,

16    whatever, tests -- drug tests, whatever it is, you'll have to

17    pay to the extent you're able to pay.

18         Do you understand that?

19              THE DEFENDANT:  Yes, sir.

20              THE COURT:  You are to notify -- now, listen to this

21    one.  This is interesting.  You are to notify all intimate

22    partners of criminal history, to include past charges,

23    convictions, and prior protective orders at the direction of

24    the U.S. Probation Office and grant them the ability to verify

25    that these intimate partners are aware of your background.

1        Do you understand that?

2              THE DEFENDANT:  Yes, sir.

3              THE COURT:  You are not going to be meeting anybody

4    anyway.  You are not going to be going out on dates and doing

5    stuff.  But if, for some reason, you develop a relationship

6    with someone that's coming to your house where you are, to the

7    extent that they become someone that you're involved with, you

8    are required to talk to pretrial services and they will tell

9    you exactly what you can and cannot do.  And it will probably

10   be that you notify that person of your situation.

11       Do you understand that?

12             THE DEFENDANT:  Yes, sir.

13             THE COURT:  And you must -- at this time, I'm going

14   to just leave it open.  You must maintain residency approved

15   by the U.S. Probation Office.

16       And I shouldn't say this, but I'm going to take the

17   chance.  I've got some concerns about sending you home to your

18   parents.  And I think the probation office does too.  I've

19   made your mother a third-party custodian.

20       In the pretrial services officer's discretion, if that

21   officer decides or pretrial decides there may be some place

22   better for you to live, for whatever reason, than your

23   parents' home, they have every authority -- I'm giving them --

24   you are to live where they tell you to.  And they can move you

25   and you've got to move, and we'll deal with your mother's

1   custodianship in that eventuality.

2       Is that clear?

3               THE DEFENDANT:  Yes, sir.

4               THE COURT:  Do you have any questions about

5   anything?

6               THE DEFENDANT:  No, sir.

7               THE COURT:  Ms. Fye, have we covered everything?

8               PROBATION OFFICER:  I believe we have, your Honor.

9               THE COURT:  Ms. Anderson, to the extent that you

10  disagree with me, I respect that.

11      Do you have any inquiries as to the conditions or any

12  suggestions as to the conditions I've placed upon the

13  defendant?

14              MS. ANDERSON:  Yes, your Honor.

15      I would ask -- and I understand this will be disputed --

16  that there be no contact with the children.

17              THE COURT:  Well --

18              MS. ANDERSON:  There are -- there is a history in

19  the reports that we've provided to the Court of him asking

20  them to lie and make false reports about Stephanie, and we

21  anticipate the children will be witnesses -- at least the

22  oldest --

23              THE COURT:  You do?

24              MS. ANDERSON:  -- child, who described an incident

25  of shooting with his father with a gun while there was a VPO

```
 1   in place.
 2            THE COURT:  I'm going to bite my tongue about that
 3   discussion.  But may I suggest something I don't -- well --
 4            MR. HAMMOND:  DHS is still monitoring -- they are
 5   still --
 6            THE COURT:  The point -- no, the point I want to
 7   make is this.  This isn't about the specifics of the past as
 8   much -- you can prove that he's under a protective order very
 9   easily and you can prove whether or not he lied on an
10   application to obtain a gun very easily.
11        And to the extent that -- I don't even know who you are
12   going to get here, Russell -- allows you to expand as much as
13   I did today is up to him.  So some of the previous incidents
14   that's gone -- we've gone into in detail today may not be
15   relevant at a trial.
16        But I don't know that and I'm not suggesting that.  I'm
17   just -- I don't know what to do about the children.
18        I'm going to dump it on you.  Excuse me.
19        I'm going to -- no, you can raise your hands and disagree
20   all you want to.  It doesn't matter.
21        I'm going to give pretrial services -- for now I'm going
22   to order that he's restricted from seeing -- who were their
23   names?  I wrote them down and I --
24            THE DEFENDANT:  XXXXX, XXXX, and XXXX.
25            MR. HAMMOND:  XXXXX, XXXX.
```

1          THE COURT:  XXXXX?

2          MR. HAMMOND:  XXXXX, X-X-X-X-X.

3          THE COURT:  Okay. X-X --

4          THE DEFENDANT:  And it's XXXX.

5          THE COURT:  XXXX?

6          THE DEFENDANT:  XXXX, X-X-X-X.

7          THE COURT:  X-X?

8          THE DEFENDANT:  X-X, yes, sir.

9      And XXXX is X-X-X-X.

10          THE COURT:  I'm going to do -- here is what I'm

11  going -- I'm going to add an -- add an O.  I am not going to

12  put it in the prohibitive one.  I am not going to put it under

13  G.

14      I am going to put it under O and say:  Defendant may

15  visit his natural children at his residence with the

16  preapproval of the U.S. Probation Office.

17      And I realize you disagree with that, but that's the best

18  we're going to do.  I don't want to tell him he can't see his

19  kids.

20      But if you believe -- are you ready to take on that

21  responsibility?  Is it fair to you?

22          PROBATION OFFICER:  We will take it on.

23          THE COURT:  What I would suggest is that you have a

24  chaperon, whatever you guys call them there, just kind of feel

25  it out to see how it goes.

1    If anyone is uncomfortable -- and then if it is, don't

2    let them come again.

3         PROBATION OFFICER:  Most likely our office will

4    instruct him, if any contact with the kids, not to discuss any

5    matters with the kids.

6         THE COURT:  Oh, that's obvious.  Oh, certainly.  Or

7    Brittany or Stephanie.

8         PROBATION OFFICER:  Correct.

9         THE COURT:  Don't even mention their names.

10   You understand that?

11   This will be about playing games and watching things on

12   TV.

13   (A discussion was held off the record between the Court

14   and courtroom deputy.)

15        THE COURT:  Okay.  We've got O:  Defendant -- what

16   did I say -- allowed to have visitation with his natural

17   children at his residence with the preapproval of the U.S.

18   Probation Office.

19   And I'm not trying to -- you guys are better at deciding

20   what to decide.  Don't take what I just said as the only

21   consideration.  You do what you think is right.

22   If they don't let you see them at the outset, that's

23   their authority.

24   Do you understand that?

25        THE DEFENDANT:  Yes, sir.

```
 1              THE COURT:  Okay.
 2         Anything else, Ms. Anderson?
 3              MS. ANDERSON:  No, your Honor.
 4              THE COURT:  Okay.
 5         Any questions, Mr. Hammond?
 6              MR. HAMMOND:  No, your Honor.
 7              THE COURT:  Have we got them, you think?
 8         (A discussion was held off the record between the Court
 9    and courtroom deputy.)
10              THE COURT:  Ma'am, I'm going to ask you to come
11    forward and we'll get all the information we need on this
12    document.  It will not be made public though, your address and
13    things.
14         Anything further from counsel?
15              MR. HAMMOND:  Not from the defendant.
16              THE COURT:  Have a seat.
17         Court is in recess subject to recall.
18         Marshal, I will stay in attendance.
19         One other thing.  Where did you spend the night last
20    night?
21              THE DEFENDANT:  Grady.
22              THE COURT:  Brady?
23              THE DEFENDANT:  Grady.
24              THE COURT:  Did he bring his stuff with him?
25              THE DEFENDANT:  No, sir.
```

```
 1            THE COURT:  Okay.  If you want to go home tonight --
 2    this is huge; I hadn't even thought about it.  You're either
 3    going to go home -- excuse me -- you're either going to go
 4    home tonight or it's going to be Tuesday morning where the
 5    marshal will bring you back here and they can pick you up
 6    here.
 7        If you have people that can go to Chickasha and pick you
 8    up once the marshal gets you back to Chickasha and provides
 9    for your release from Chickasha, somebody waiting right there
10    at the front door can then take you -- I better shut up or I'm
11    going to tell him something wrong.
12        Have I got it right so far?
13            PROBATION OFFICER:  You have, your Honor.  Yes.
14            THE COURT:  Okay.  This lady will tell them how to
15    do all that, and you will be able to go home to Duncan
16    tonight.
17        Those one of two things, I don't know which is going to
18    happen.  Do you understand that?  Or the marshal will bring
19    you back here Tuesday morning of next week and release you
20    from here.
21            THE DEFENDANT:  I guess I need to go down there and
22    come back.
23            THE COURT:  Somebody -- well, now, listen to me.
24    One of two things are going to happen.  If you have somebody
25    that can go to Chickasha and be waiting on you tonight --
```

```
 1                 THE DEFENDANT:  Yes.
 2                 THE COURT:  -- you will be released tonight.
 3                 THE DEFENDANT:  Yes.
 4                 THE COURT:  If you don't have anybody that can do
 5       that for whatever reason, you will be released from Oklahoma
 6       City Tuesday morning -- next Tuesday.
 7                 THE DEFENDANT:  Okay.  I have someone.  So ankle
 8       bracelet is the Tuesday part?
 9                 THE COURT:  They will talk to you about ankle
10       bracelets.
11                 PROBATION OFFICER:  We're going to put it on before
12       you leave.
13                 THE COURT:  Right now.  That's right.
14            Anything else?  Anything else?
15            Have a seat and I will stay in attendance to expedite it.
16            Court is in recess subject to call.
17                 THE DEFENDANT:  Thank you.
18            (A short recess was taken.)
19                 THE COURT:  The Court will reconvene in this matter
20       at this time.  And pursuant to local rules at this time, all
21       exhibits -- and yours weren't even admitted, Mr. Hammond.
22            I assume you move the admission, and I assume there is no
23       objection for the purpose of this proceeding.
24            All exhibits considered by the Court at this time,
25       pursuant to local rule, will be returned to the possession and
```

1  control of the respective parties presenting same with the

2  order and admonition that they not be altered or amended in

3  any fashion.

4      Copies of the same be made available to opposing parties,

5  and if ever needed to re-present the matters or the documents

6  to the record for the purpose of making a full record, you

7  will be required to do that.

8      Ms. Anderson?

9          MS. ANDERSON:  Yes, your Honor.  In our presentation

10 I noticed some redactions of child names.

11         THE COURT:  Uh-huh.

12         MS. ANDERSON:  May I redact those names and provide

13 a copy to defense counsel that includes those new redacted

14 versions as opposed to the ones that have the names?

15         THE COURT:  That sounds really important, but I'm

16 not digesting it very well.

17     You have copies of redacted names, which means they are

18 not there --

19         MS. ANDERSON:  We missed some.

20         THE COURT:  Okay.  There are some names -- so he's

21 got them now.

22         MS. ANDERSON:  He's got them, yes.

23         MR. HAMMOND:  If they want to give me a new set with

24 the names redacted, I have --

25         THE COURT:  You are afraid you're going to

```
1   (unintelligible) and see what they are?

2           MR. HAMMOND:  I have no objection if she wants to do

3   that.  I have seen --

4           MS. ANDERSON:  And we're happy to tell him the

5   names, but for the purpose of --

6           THE COURT:  -- a final copy.

7           MS. ANDERSON:  -- a final copy and also complying

8   with Title 18 United States Code Section 3509 --

9           THE COURT:  I understand.  Minors.  I understand.

10          MS. ANDERSON:  Yes.

11          THE COURT:  Okay.  That will be approved.

12      Anything else?

13      Okay.  Come get your exhibits.

14      Court's in recess.

15

16                      (End of proceedings.)

17

18

19

20

21

22

23

24

25
```

CHRISTINA L. CLARK, RPR, CRR
United States Court Reporter
200 N.W. Fourth Street, Suite 5419
Oklahoma City, Oklahoma  73102
christina_clark@okwd.uscourts.gov - ph(405)609-5123

```
 1                    CERTIFICATE OF OFFICIAL REPORTER

 2         I, Christina L. Clark, Federal Official Realtime Court

 3   Reporter, in and for the United States District Court for the

 4   Western District of Oklahoma, do hereby certify that pursuant

 5   to Section 753, Title 28, United States Code that the

 6   foregoing is a true and correct transcript of the

 7   electronically recorded proceedings held in the above-entitled

 8   matter, transcribed to the best of my ability from said

 9   recording, and that the transcript page format is in

10   conformance with the regulations of the Judicial Conference of

11   the United States.

12

13         Dated this 4th day of February, 2019.

14

15                               s/CHRISTINA L. CLARK_____
                                 Christina L. Clark, RPR, CRR
16

17

18

19

20

21

22

23

24

25
```